1
2
3
4
5
6
7

# UNITED STATES DISTRICT COURT

## WESTERN DISTRICT OF WASHINGTON

## AT SEATTLE

| | |
|---|---|
| MATTHEW ALVAREZ and SCOTT HALLIWELL, on behalf of themselves and all others similarly situated, | Case No. |
| | **COMPLAINT – CLASS ACTION** |
| *Plaintiffs*, | **JURY DEMAND** |
| v. | |
| REALPAGE, INC., a Delaware corporation; GREYSTAR REAL ESTATE PARTNERS, LLC, a Delaware limited liability company; LINCOLN PROPERTY COMPANY, a Texas corporation; FPI MANAGEMENT, INC., a California corporation; MID-AMERICA APARTMENT COMMUNITIES, INC., a Tennessee corporation; AVENUE5 RESIDENTIAL LLC, a Delaware limited liability company; EQUITY RESIDENTIAL, a Maryland real estate investment trust; ESSEX PROPERTY TRUST, INC., a Maryland corporation; ESSEX MANAGEMENT CORPORATION, a California corporation; AVALONBAY COMMUNITIES, INC., a Maryland corporation; CAMDEN PROPERTY TRUST, a Texas real estate investment trust; THRIVE COMMUNITIES MANAGEMENT, LLC, a Washington limited liability company; and SECURITY PROPERTIES INC., a Washington corporation, | |
| *Defendants*. | |

**EDELSON PC**
350 N. LaSalle Street, 14th Floor, Chicago, Illinois 60654
Tel: 312.589.6370 • Fax: 312.589.6978

# TABLE OF CONTENTS

I.   NATURE OF THE ACTION .................................................................................1

II.  PARTIES ...........................................................................................................3

III. JURISDICTION AND VENUE ............................................................................5

IV.  FACTUAL ALLEGATIONS ...............................................................................6

   A.  RealPage Deploys Artificial Intelligence to Facilitate a Cartel Amongst Lessors.......6

   B.  The Market for Multifamily Residential Housing In Metropolitan Areas ...............11

   C.  With The Assistance of AI, The Multifamily Residential Housing Market Is Ideally
      Suited to Collusion...........................................................................................12

      1.  There Are High Barriers to Entry .................................................................12

      2.  Tenants Have High Switching Costs .............................................................13

      3.  Demand For Housing Is Relatively Inelastic.................................................14

      4.  The Multifamily Residential Housing Market Is Highly Concentrated ...............14

      5.  Multifamily Residential Housing Is Relatively Fungible.................................15

      6.  RealPage Facilitates the Sharing of Confidential and Competitively-Sensitive
         Pricing Information ...................................................................................15

      7.  A Revolving Door Confirms A Highly Networked Industry With Many
         Opportunities to Conspire .........................................................................16

         a.  Greystar—RealPage ...........................................................................16

         b.  FPI—RealPage ..................................................................................21

         c.  Lincoln—RealPage.............................................................................22

         d.  Equity Residential—RealPage.............................................................24

         e.  MAAC—RealPage .............................................................................25

         f.  Essex—RealPage ...............................................................................26

         g.  AvalonBay—RealPage........................................................................26

         h.  Camden Property Trust—RealPage .......................................................27

      8.  The Regular Meetings of Trade Associations and Other Networking Tools
         Confirm Numerous Opportunities to Conspire .............................................29

         a.  RealPage's RealWorld Conference and Summits ...................................29

         b.  RealPage User Group and Steering Committee ......................................30

         c.  National Multifamily Housing Council..................................................31

         d.  Other Trade Associations ....................................................................32

   D.  Additional Defendant-Specific Allegations ........................................................33

      1.  Greystar Real Estate Partners, LLC..............................................................33

      2.  Lincoln Property Company .........................................................................34

      3.  FPI Management, Inc. ................................................................................34

      4.  Mid-America Apartment Communities, Inc...................................................35

      5.  Avenue5 Residential, LLC .........................................................................36

      6.  Equity Residential ....................................................................................36

      7.  Essex Property Trust, Inc. and Essex Management Corporation .......................37

      8.  Thrive Communities Management, LLC ........................................................38

      9.  Security Properties, Inc. ............................................................................38

V.   CLASS ALLEGATIONS....................................................................................39

VI.  PRAYER FOR RELIEF .....................................................................................43

**VII. JURY TRIAL DEMANDED** ...............................................................................**44**

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27

**EDELSON PC**
350 N LaSalle Street, 14th Floor, Chicago, Illinois 60654
Tel: 312.589.6370 • Fax: 312.589.6378

Case 3:23-cv-00331   Document 1    Filed 11/10/22   Page 3 of 48  PageID #: 3

Plaintiffs Matthew Alvarez and Scott Halliwell bring this case, individually and on behalf of all others similarly situated, against Defendants RealPage, Inc., Greystar Real Estate Partners, LLC, Lincoln Property Company, FPI Management, Inc., Mid-America Apartment Communities, Inc., Avenue5 Residential LLC, Equity Residential, Essex Property Trust, Inc., Essex Management Corporation, AvalonBay Communities, Inc., Camden Property Trust, Thrive Communities Management, LLC, and Security Properties Inc. and allege as follows upon personal knowledge as to themselves and their own acts and experiences, and as to all other matters, upon information and belief.

## I.      NATURE OF THE ACTION

1.      Every day, major corporations use algorithms, or complex and often non-transparent computer programs and formulas, to make decisions that impact people's lives.  The use of artificial intelligence technology to make predictions, recommendations, or decisions has enormous potential to improve society.  But it also presents serious risks, such as the potential for unfair or discriminatory outcomes or the perpetuation of existing socioeconomic disparities. This case is a prime example of how these risks became a reality.  As detailed throughout this complaint, Defendants developed and used proprietary artificial intelligence and algorithmic decision-making systems to help big housing landlords operate as a cartel to push up rents above competitive levels, all to increase profits at the expense of thousands of unwitting tenants.

2.      Plaintiffs Matthew Alvarez and Scott Halliwell, like millions of Americans, are renters.  Defendant RealPage, Inc. is a software company that developed a property management revenue software called AI Revenue Management ("AIRM") (formerly known as YieldStar). The AIRM suite includes a pricing algorithm driven by machine learning and designed to aid landlords with driving rent up as high as possible.  It is euphemistically described as a "pricing optimization" software.  But its real secret lies in its coordination of pricing behavior and sharing of real-time, non-public and competitively sensitive pricing and supply data across property managers and owners of multifamily residential housing around the country who would otherwise be independent, direct competitors with one another.

CLASS ACTION COMPLAINT
Case No.:

**EDELSON PC**
350 N. LaSalle Street, 14th Floor, Chicago, IL 60654
Tel: 312.589.6370 • Fax: 312.589.6378

Case 3:23-cv-00331    Document 1    Filed 11/10/22    Page 4 of 48    PageID #: 4

3.      RealPage's products, including AIRM, are used by numerous property owners and property management companies to set the cost of housing for millions of rentable apartment units, including Defendants Greystar Real Estate Partners, LLC ("Greystar"), Lincoln Property Company ("Lincoln"), FPI Management, Inc. ("FPI"), Mid-America Apartment Communities, Inc. ("MAAC"), Avenue5 Residential LLC ("Avenue5"), Equity Residential, Essex Property Trust, Inc. and Essex Management Corporation (together, "Essex"), AvalonBay Communities, Inc. ("AvalonBay"), Camden Property Trust ("Camden"), Thrive Communities Management, LLC ("Thrive Communities"), and Security Properties, Inc. ("Security Properties") (collectively, "Lessors" or "the Lessor Defendants").

4.      The effectiveness of RealPage's pricing algorithm for rentals is critically dependent on the data behind it, including the otherwise private and competitively-sensitive real-time pricing and supply data of each of RealPage's clients, including the Lessor Defendants. As RealPage openly admits, its "breakthrough revenue management software introduced game-changing pricing technology to the industry," based on its use of, among other factors, "competitor pricing." And unlike other revenue management software which relies solely on publicly-available pricing information, RealPage instead relies on private and competitively-sensitive real-time rental data provided by its clients.

5.      As a condition of using RealPage's services, RealPage's clients, including the Lessor Defendants, agree to provide their private pricing and supply data to RealPage in real-time, and agree that RealPage may use each client's data for purposes of its pricing algorithm for *all* RealPage clients, not just that client. No Lessor Defendant would agree to share its competitively-sensitive and private pricing and supply information to benefit its competitors, unless it knew every other RealPage client reciprocated by sharing their data, too. Each Lessor Defendant knows that every other Lessor Defendant and RealPage client is also sharing their private data with RealPage for the benefit of all Lessor Defendants and RealPage clients. While no Lessor Defendant would share its private pricing information with competitors if they were the only ones doing so, the Lessor Defendants as a whole benefit when they act in concert to

share such information for one another's benefit through the RealPage pricing algorithm. Doing so improves their collective ability to coordinate rent increases throughout the country, and thus to charge supra-competitive prices for rentals.

6. The Lessor Defendants also agree to follow RealPage's pricing instructions the vast majority of the time. As RealPage has admitted, its clients only push back against recommendations 10-20% of the time, and in practice, they abide by RealPage's recommendations without modification 90% of the time. RealPage emphasizes to its clients that its ability to help them generate higher profits turns on their acquiescence to the algorithm's instructions.

7. The Lessor Defendants' agreement to use RealPage's pricing algorithm is an unlawful restraint of trade and unfair business practice. It has exacerbated the housing crisis by driving rents up above what the competitive level otherwise would have been. Plaintiffs bring this action to stop this unlawful practice, and to recover treble damages on behalf of themselves and other similarly-situated renters.

## II. PARTIES

8. Plaintiff Matthew Alvarez is a resident of Atlanta, Georgia. He signed a lease commencing in October 2020 for multifamily residential housing in Atlanta in a building managed by Defendant Greystar Real Estate Partners, LLC. His rent increased by approximately 8% at his first renewal. Upon information and belief, Greystar used Defendant RealPage, Inc.'s pricing algorithms to set Mr. Alvarez's rent. Because of Defendants' unlawful and anticompetitive acts, Mr. Alvarez suffered harm by paying rent at artificially inflated levels.

9. Plaintiff Scott Halliwell is a resident of Seattle, Washington. Mr. Halliwell signed a lease commencing in October 2021 for multifamily residential housing in Seattle in a building managed by Defendants Essex Property Trust, Inc. and Essex Management Corporation (together, "Essex"). Upon information and belief, Essex used Defendant RealPage, Inc.'s pricing algorithms to set Mr. Halliwell's rent. Because of Defendants' unlawful and anticompetitive acts, Mr. Halliwell suffered harm by paying rent at artificially inflated levels.

10. Defendant RealPage, Inc. is a Delaware corporation with its headquarters in Richardson, Texas. As described herein, RealPage sells a pricing algorithm to tens of thousands of property managers and owners, including the ten largest multifamily property management companies in the country. RealPage uses the algorithm to orchestrate and enforce a cartel amongst the Lessor Defendants identified below.

11. Defendant Greystar Real Estate Partners, LLC ("Greystar") is a Delaware limited liability company with its headquarters in Charleston, South Carolina. It owns and operates apartment buildings around the country that utilize RealPage's pricing algorithm.

12. Defendant Lincoln Property Company ("Lincoln") is a Texas corporation with its headquarters in Dallas, Texas. It owns and operates apartment buildings around the country that utilize RealPage's pricing algorithm.

13. Defendant FPI Management, Inc. ("FPI") is a California corporation with its headquarters in Folsom, California. It owns and operates apartment buildings around the country that utilize RealPage's pricing algorithm.

14. Defendant Mid-America Apartment Communities, Inc. ("MAAC") is a Tennessee corporation with its headquarters in Germantown, Tennessee. It owns and operates apartment buildings around the country that utilize RealPage's pricing algorithm.

15. Defendant Avenue5 Residential LLC ("Avenue5") is a Delaware limited liability company with its headquarters in Seattle, Washington. It owns and operates apartment buildings around the country that utilize RealPage's pricing algorithm.

16. Defendant Equity Residential is a Maryland real estate investment trust with its headquarters in Chicago, Illinois. It owns and operates apartment buildings around the country that utilize RealPage's pricing algorithm.

17. Defendant Essex Property Trust, Inc. is a Maryland corporation with its headquarters in San Mateo, California. Defendant Essex Management Corporation is a California corporation with its headquarters in San Mateo, California. Together, Plaintiffs refer

CLASS ACTION COMPLAINT
Case No.:

4

EDELSON PC
2350 N
Tel: 312 589 6370 • Fax: 312 589 6378

Case 3:23-cv-00331   Document 1   Filed 11/10/22   Page 7 of 48   PageID #: 7

to these entities as "Essex." Essex owns and operates apartment buildings around the country that utilize RealPage's pricing algorithm.

18. Defendant AvalonBay Communities, Inc. ("AvalonBay") is a Maryland corporation with its headquarters in Arlington, Virginia. It owns and operates apartment buildings around the country that utilize RealPage's pricing algorithm.

19. Defendant Camden Property Trust ("Camden") is a Texas real estate trust with its headquarters in Houston, Texas. It owns and operates apartment buildings around the country that utilize RealPage's pricing algorithm.

20. Defendant Thrive Communities Management, LLC ("Thrive Communities") is a Washington limited liability company with its headquarters in Seattle, Washington. It owns and operates apartment buildings around the country that utilize RealPage's pricing algorithm.

21. Defendant Security Properties Inc. ("Security Properties") is a Washington corporation with its headquarters in Seattle, Washington. It owns and operates apartment buildings around the country that utilize RealPage's pricing algorithm.

### III.   JURISDICTION AND VENUE

22. This Court has jurisdiction over this action under 28 U.S.C. §§ 1331 & 1337 because it arises under Section 1 of the Sherman Act, 15 U.S.C. § 1, and Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15 & 26.

23. This Court has personal jurisdiction over Defendants under Section 22 of the Clayton Act, 15 U.S.C. § 22, and by the State of Washington's long arm statute, RCW 4.28.185, because each Defendant resides, or is found, or transacts business within this State, and because acts or omissions giving rise to Plaintiffs' claims occurred in this State.

24. This Court has venue in this District under Section 22 of the Clayton Act, 15 U.S.C. § 22, and the federal venue statute, 28 U.S.C. § 1391, because one or more Defendants maintain business facilities, have agents, transact business, or are otherwise found within this District and certain unlawful acts alleged herein were performed and had effects within this District.

# IV.    FACTUAL ALLEGATIONS

## A.    RealPage Deploys Artificial Intelligence to Facilitate a Cartel Amongst Lessors

25.    RealPage sells a groundbreaking software tool called RealPage AI Revenue Management ("AIRM"), formerly known as YieldStar Revenue Management.  According to RealPage, AIRM is "the first pricing optimization tool to fully employ AI [artificial intelligence] and machine learning that delivers precise supply and demand forecasts to help properties exceed the market by 2%-5%."

26.    Artificial intelligence and machine learning have revolutionized numerous industries.  The field of machine learning is concerned with the use of computer algorithms and statistical models to analyze and draw inferences from patterns in data.  In simplified terms, machine learning is the use of large amounts of data to answer specific questions, typically by identifying historical patterns correlated with particular desired objectives.  Machine learning and artificial intelligence are not synonymous, but RealPage uses the terms interchangeably in describing its products, as do Plaintiffs herein.

27.    As RealPage recognizes, "AI is only as powerful as the data that fuels it."  Its sales brochures explain that "[w]ithout an expansive data set comprised of accurate and relevant data and the full capability to connect intelligence for precise problem-solving, AI becomes an impediment—and even a detriment—to optimal performance instead of an advantage."  Indeed, "the extent of problem-solving and profit-building capabilities for real estate machine learning systems is wholly dependent on the scope and quality of the data (i.e., the 'corpus') on which the algorithms are based.  [A]lgorithms can learn patterns from data, rather than relying on manual programming, and can continuously integrate new information and detect emerging trends or new demands."

28.    RealPage touts AIRM as a product that helps "solve revenue problems" by relying on three kinds of data sets: new and renewal lease data, leasing traffic and conversion data, and real-time changes in supply and demand.  Its AIRM software is designed to aid property owners

and managers understand supply and demand trends, and to provide "[p]recision rent pricing adjusted throughout the day for greater capture of revenue opportunities."

29.     One of RealPage's AI products concerns pricing. RealPage brags that this product "[l]everages [the] multifamily[ industry]'s largest lease transaction database" to "[c]reate accurate supply and demand forecasts" that enable property owners to "[o]utperform the market by 2-5%." Thus, all Lessor Defendants and other RealPage clients understand that a key feature of this service which enhances its effectiveness in raising revenues is RealPage's access to the private pricing and supply information of their competitors.

30.     RealPage boasts on its website that AIRM is a "[n]ext-generation apartment pricing software that can drive up to 400% year-one ROI," providing "Pricing Optimization That Outperforms the Market 2%-5%." According to RealPage, the AIRM product "helps you continuously maximize asset value with precision pricing capabilities. It's the industry's only price optimization solution powered by next-generation data that makes it possible to consistently reduce vacancies and maximize rents. Building on deep experience with millions of units and decades of successful results with clients outperforming in every market, AI Revenue Management accelerates the accuracy of its supply and demand algorithms and optimizes amenity pricing to drive revenue yields even further."

31.     Critical to its success, AIRM relies on pricing algorithms that "factor real-time lease transaction data spanning 13M+ units that include[] true performance indicators like lease trade-out, average vacant days between leases and retention rates for more precise outcomes."

32.     Included in the trove of data fueling RealPage's ARM pricing software is the non-public, competitively sensitive unit-level information about what competitors charge and their occupancy rates. RealPage's clients feed their own, private rental data to RealPage's pricing algorithm, effectively providing RealPage's clients with insight into what their nearby competitors are charging as well as their occupancy levels. Indeed, to use RealPage's price optimization services, each Lessor Defendant and client agrees to share their private leasing data with RealPage for the purpose of providing its services to *all* clients. No Lessor Defendant

EDELSON PC
350 ... 
Tel: 912 589 6370 • Fax: 312 589 6378

would agree to share such competitively-sensitive information to benefit its competitors unless it knew that every other Lessor Defendant and RealPage client was also sharing its own information for that purpose.

33. The quantity of such private data is very important to RealPage's success. As RealPage admits, "[i]t wasn't until 2016 that the multifamily industry was reported as having achieved critical mass for revenue management adoption," with a significant number of firms beginning to adopt software designed to assist with pricing strategies. Prior to that, the industry custom and strategy was to maximize occupancy, even if they needed to reduce prices or offer economically valuable incentives to do so.

34. However, with YieldStar/RealPage, industry practice began to shift suddenly. For the first time, de facto coordination amongst competitors designed to achieve market-wide manipulation of rental prices was possible through data aggregation. Indeed, RealPage warned the industry that "[o]wners and operators [of rental properties] who ignore or delay adopting AI advancements in pricing optimization for today's apartment market do so at their own peril." The converse is also true: the effectiveness of RealPage's pricing algorithm for its customers (*i.e.*, the algorithm's ability to successfully increase client profits) depends critically on the number of firms using it, because the more insight the algorithm has into private and competitively-sensitive pricing data, the better it can engineer successful market-wide price hikes that benefit all of its customers, including the Lessor Defendants. At the same time, the Lessors have greater reassurance that otherwise risky price hikes will stick due to their understanding that their competitors are also using the same algorithm and are thus inclined to make similar pricing decisions. For example, a recent exposé by ProPublica demonstrated that in one Seattle neighborhood, "70% of apartments were overseen by just 10 property managers, every single one of which used pricing software sold by RealPage."

35. The aggregation of actual lease transaction data (rather than publicly-advertised prices) is key to RealPage's success in orchestrating market-wide rent increases and stabilization of supply. Such data is not normally public. One property manager near Dallas stated that when

she began using the algorithm, it prompted her to push for steep increases based on its determination that similar buildings in the area were charging more. According to this property manager, "[l]easing slowed down to a crawl" after the rate jumps.

36. Unsurprisingly, RealPage's sudden adoption by numerous competitors, who together control a substantial portion of multifamily residential housing supply in the United States, has led to higher rent prices across the board. Speaking to an audience of real estate tech executives in Nashville, Tennessee in summer 2021, RealPage Vice President Jay Parsons bragged about RealPage's success in engineering market-wide rent hikes: "Never before have we seen these numbers." In a video touting the company's services, Mr. Parsons remarked that rents had recently shot up by as much as 14.5%. Mr. Parsons asked his colleague, Andrew Bowen, another RealPage executive, what role RealPage's AIRM software had played. Mr. Bowen candidly admitted: "I think it's driving it, quite honestly. As a property manager, very few of us would be willing to actually raise rents double digits within a single month by doing it manually." Mr. Bowen's statement is a candid admission that such a dramatic price hike would be against the independent economic interest and judgment of any lessor acting unilaterally; it is feasible only when the Lessors understand that they are all making similar moves and will not undercut one another, thanks to RealPage's coordination of their pricing behavior.

37. Mr. Bowen's sentiment is shared by RealPage's customers. One RealPage customer explained that "[t]he beauty of YieldStar is that it pushes you to go places that you wouldn't have gone if you weren't using it," also referring to the fact that a property manager or owner, acting unilaterally, would be highly unlikely to propose rent increases higher than the market level, absent re-assurance (provided by RealPage) that competitors would follow suit.

38. RealPage's customers generally follow the algorithm's pricing recommendations, accepting the algorithm's suggestions approximately 90% of the time. A former RealPage executive, Ryan Kimura, said RealPage's customers typically pushed back on the algorithm's pricing recommendations only about 10-20% of the time.

EDELSON PC
350
Tel: 912 589 6370 · Fax: 312 589 6378

39.     Moreover, RealPage discourages its customers from bargaining with renters, and may even recommend that landlords and property managers accept a lower occupancy rate to raise rents and make more money.  For example, in a 2017 earnings call, Steve Winn, who at that time was the CEO of RealPage, confirmed that one large property management company learned that by following the algorithm's recommendation to reduce its occupancy rate from 97-98% to 94-96%, it could increase its revenues by 3-4%.  Such manipulation of occupancy rates is a critical component of RealPage's pricing software.  Another example of the manipulation of housing supply is assisting Lessor Defendants and other RealPage clients with the staggering of their lease renewals.  Applied market-wide, and on the basis of private unit-level data from competitors about their own occupancy information, this feature enables the Lessor Defendants to artificially coordinate supply trends across the market to avoid any decline in rental prices that could occur in case of otherwise normal oversupply.

40.     Effectively, RealPage's customers, including the Lessors, have ceded their decision-making on prices and supply to RealPage.  Thus, a single entity—RealPage— effectively decides the rent that all major competitors in the multifamily residential housing market will charge their tenants, as well as the extent to which housing supply will be made available to the public.  This is in contrast to a healthy and functioning competitive market, where each competitor is expected to exercise its own independent judgment to determine what price to charge customers, with the goal of maximizing occupancy rates.

41.     One of the RealPage algorithm's primary architects is Jeffrey Roper.  Prior to his work to develop the algorithm, Mr. Roper was the director of revenue management for Alaska Airlines when it and other major airlines began developing price-setting software in the 1980s. The software allowed airlines to share planned routes and prices with one another before publicizing them, enabling the airline companies to avoid competition and maintain airline ticket prices higher than they otherwise would have been.  The United States Department of Justice prosecuted several airlines in connection with this scheme, which the Department said cost consumers more than a billion dollars in just four years between 1988 and 1992.  Ultimately,

EDELSON PC
350 N. LaSalle Street, 14th Floor
Chicago, Illinois 60654
Tel: 312.589.6370 • Fax: 312.589.6378

Alaska Airlines and others entered a consent decree with the Department to change how they used the pricing software.

42.     Mr. Roper joined RealPage in 2004 to improve software the company had bought from another large property owner and manager of apartment buildings.  He is a major proponent of aggressive rent hikes across the industry, and has publicly decried property owners and managers who do not fall in line.  As he explained: "If you have idiots undervaluing, it costs the whole system."

43.     At the end of 2020, RealPage reported in its final Securities and Exchange Commission filing that its pricing algorithm was being used to set prices for 19.7 million rental units across the country.  RealPage was purchased by a private equity firm, Thoma Bravo, a few months later for $10.2 billion.

## B.     The Market for Multifamily Residential Housing In Metropolitan Areas

44.     The relevant market is the market for the lease of multifamily residential housing throughout the United States.

45.     Multifamily residential housing rentals are not interchangeable with single-family homes or other forms of housing.  Purchasing property requires significant financial resources, including for a down payment, long-term mortgage, and other expenses related to home ownership, such as property taxes, home insurance, more utilities than a rental, maintenance, and other costs of ownership.  As one market analysis reports, home prices increased 50.5% from 2017 to 2022.  At the same time, the 30-year fixed mortgage average jumped 88.7% year-over-year in the second quarter of 2022.  As "the single family home market continues to price out would-be homeowners, the multifamily market reaps the benefits," including through effective rent growth of 13.5% as of the second quarter of 2022 alone.

46.     These dramatic increases in rent growth have not undermined Defendants' profitability, confirming that the Lessor Defendants can successfully impose a small but significant, non-transitory increase in price (a "SSNIP") without turning away so many

EDELSON PC
350 N. LaSalle Street, 14th Floor
Chicago, Illinois 60654
Tel: 312 589 6370 • Fax: 312 589 6378

customers as to render the increase unprofitable. The market is properly defined because the Lessor Defendants, with RealPage's assistance, have the ability to profitably impose a SSNIP.

47.     To the extent a definition of the relevant geographic market is required, the relevant geographic market is the United States and includes discrete geographic submarkets. The Lessor Defendants compete with one another on a national level, and RealPage operates its pricing algorithm nationally. RealPage's pricing software is premised on its ability to account for local, regional, and national housing factors that inform pricing at the local level. At the appropriate stage, Plaintiffs will propose a class-wide method for measuring antitrust impact and damages that accounts for all pertinent local, regional, and national housing factors.

## C.     With The Assistance of AI, The Multifamily Residential Housing Market Is Ideally Suited to Collusion

48.     Several characteristics of the market for the sale of multifamily residential real estate leases make it susceptible to collusion, including high barriers to entry, high switching costs for tenants, market concentration, inelastic consumer demand, interchangeability of residential unit leases, the exchange of sensitive information amongst competitors, and a highly networked industry with numerous trade association events and a revolving door between and amongst employees that create ample opportunities to collude.

### 1.     There Are High Barriers to Entry

49.     A cartel is less likely to be successful in driving and maintaining prices above the competitive level if a new competitor can easily enter the scene and quickly gain market share by undercutting members of the cartel on price. In industries where barriers to entry are high, however, the threat of a new competitor is diminished, and existing competitors are more likely to be able to effectuate a successful cartel.

50.     The barriers to entry into the multifamily residential real estate market are significant. The acquisition or construction of new multifamily residential properties is extremely costly, requiring a large amount of capital, often in tens or hundreds of millions of

EDELSON PC
350
Tel: 912 589 6370 • Fax: 312 589 6378

dollars; various kinds of management expertise; and significant amounts of time.  As a result, the threat of entry by new competitors is ineffective at undermining the efficacy of a cartel.

## 2. **Tenants Have High Switching Costs**

51. Cartels are also less likely to be effective if customers can easily switch to evade the cartel' price hikes, for example, if they can easily switch from one brand of pencil or gasoline to another.

52. Rental housing, however, has high switching costs.  Tenants are typically subject to leases of a fixed term of 12 months, during which they are unable to leave without potentially incurring substantial penalties or liabilities.  Additionally, in the multifamily residential industry in which the Lessor Defendants operate, leases do not typically lapse into month-to-month terms after the initial 12 month period expires.  Instead, the Lessor Defendants typically coerce tenants into renewing their leases for a year or another long-term lease.  They accomplish this by threatening to raise rent on month-to-month leases by a very significant amount.  In contrast, longer term leases are offered on a much more favorable cost basis.  Therefore, tenants in Lessor Defendants' properties realistically only have an opportunity to switch housing once a year.

53. Moreover, even when tenants do have the option of moving, doing so is costly and inconvenient.  Tenants may also have limited alternative options close to where they work or maintain family and other social ties.

54. Further, for most people, the only alternative to renting is purchasing property, which usually requires accumulated capital and a high income.  Therefore, purchasing property is not usually an adequate or easily attainable substitute for rental housing.  As one market analysis of 2022 multifamily capital markets reports, "[a]s the state of the current single family home market continues to price out would-be homeowners, the multifamily market reaps the benefits."  The same report explains that "[e]ffective rent growth accelerated to 13.5% over the trailing twelve months [prior to the second quarter of 2022], the highest rate on record."  The ability of multifamily residential property owners and managers to drive rent up by significant

amounts confirms their market power, as well as the inability of renters to respond by exiting the multifamily residential rental market by purchasing property.

55.     As a result of the high costs of switching, tenants are less able to undermine the effectiveness of a cartel by seeking alternative housing options.

### 3.     Demand For Housing Is Relatively Inelastic

56.     In economics, the "price elasticity of demand" refers to the degree to which demand responds to a change in price.  If a change in price for a product has a marked effect on corresponding demand, then the product is said to have a high elasticity of demand.  In contrast, if a change in price for a product has a minimal effect on corresponding demand, then the product is said to have a low elasticity of demand.

57.     For example, if a café were to raise the price of its cappuccinos from $4 to $10, demand would fall because fewer people would be willing to pay that price.  Cappuccinos are not a life necessity.  In contrast, every person needs a place to live, and many people need a place to live in reasonable proximity to their place of work.  Thus, demand for housing is relatively inelastic because even if prices go up significantly, people will always need housing.

58.     Markets with relatively inelastic demand are more susceptible to collusion because members of a cartel are more likely to be able to drive prices higher, and to reap supra-competitive profits, without significantly reducing demand.

### 4.     The Multifamily Residential Housing Market Is Highly Concentrated

59.     Collusion is also more likely in markets with high concentration—*i.e.*, where relatively few firms control a significant share of the market.

60.     The multifamily residential real estate market is relatively concentrated, particularly in major metropolitan areas and in and around high growth cities.  For example, a recent exposé by ProPublica demonstrated that in one Seattle neighborhood, "70% of apartments were overseen by just 10 property managers, every single one of which used pricing software sold by RealPage."  Similar trends are true throughout the country.

EDELSON PC
350 North LaSalle Street, 14th Floor
Tel: 312 589 6370 • Fax: 312 589 6378

### 5. Multifamily Residential Housing Is Relatively Fungible

61.     Markets for products that are relatively interchangeable, with few differentiating features, are also more susceptible to collusion.

62.     Multifamily residential housing is relatively fungible.  Features like square footage, number of bedrooms and bathrooms, amenities (such as balconies, parking, in-unit laundry, etc.), floor level, and so on, are priced in a relatively standardized way and are typically the primary basis on which both lessors and prospective tenants compare options.

63.     Indeed, RealPage's pricing software itself confirms the relative fungibility of multifamily residential leases.  Lessor Defendants and other RealPage clients making pricing decisions are able to compare units to one another based on these discrete and standardized features.  RealPage's pricing software makes suggestions about what competitors are charging for like features that are viewable on a real-time basis, even identifying specific building and unit comparators from competitors.  Tenants and prospective tenants also compare the price of units on the basis of such standardized features.

### 6. RealPage Facilitates the Sharing of Confidential and Competitively-Sensitive Pricing Information

64.     As discussed above, RealPage also acts as a conduit for the Lessor Defendants to share non-public and competitively-sensitive pricing and supply information with one another in real-time.  Each Lessor Defendant and RealPage client agrees to share its own unit-level pricing and occupancy information with RealPage, as a condition of using RealPage's pricing software. Each Lessor Defendant and RealPage client also understands that RealPage utilizes that competitively-sensitive information to make recommendations to all of their competitors. Because this information sharing occurs in real-time, it helps facilitate anti-competitive price-fixing on an unprecedented scale.

EDELSON PC
350 ... 06 ...
Tel: 912 589 6370 · Fax: 312 589 6378

**7.** **A Revolving Door Confirms A Highly Networked Industry With Many Opportunities to Conspire**

65. The property management industry is relatively concentrated and closely-knit, particularly with respect to managers of multifamily residential housing units in high-growth rental markets. These connections are reflected by the revolving door of employees between and amongst the Lessor Defendants and RealPage. Cross-competitor connections are common, and interactions are frequent, creating ample opportunities to conspire.

**a.** **Greystar—RealPage**

66. The following are examples of the dozens of people who moved between Greystar and RealPage.

67. Greystar's Senior Vice President and Managing Director of Global Operating Systems was previously the Senior Vice President of Product Management at RealPage.

68. A current Director of Client Services at Greystar was previously a Director of Business Development for YieldStar products at RealPage.

69. A current Manager of Revenue Systems at Greystar was previously employed by RealPage in Charlotte, North Carolina.

70. The Director of Revenue Management at Greystar was previously a YieldStar Advisor at RealPage.

71. One person worked as a Regional Account Manager for a company acquired by RealPage before becoming a Marketing Associate at Greystar, then a Regional Marketing Manager at FPI, and then moved back to Greystar as a Senior Marketing Associate.

72. An AIRM Performance Advisor at RealPage was previously a Senior Community Manager at Greystar.

73. A Revenue Management Advisor at RealPage was previously a Leasing Professional at Greystar.

74. A Revenue Management Advisor and AIRM Performance Advisor for RealPage was previously a Regional Property Manager for Greystar.

75. A RealPage AIRM Performance Advisor on the Asset Optimization Team was previously a Regional Property Manager at Greystar.

76. A Revenue Advisor at RealPage was previously a Revenue Associate at Greystar.

77. A Senior Manager for Revenue Advisory Services and the AIRM Product at RealPage was previously a Manager of Revenue Systems at Greystar.

78. A Revenue Management Consultant at RealPage was previously a Community Manager at Greystar and an employee of Equity Residential.

79. A Revenue Management Advisor at RealPage was previously a Senior Multi-Site Community Manager at Greystar.

80. A current RealPage AIRM Revenue Management Advisor was previously a Property Manager at Greystar and also at Essex. This individual boasted that in their role as a Property Manager at Essex they were "responsible for post lease up rent increases and renewal management" and successfully "achieved 7% budgeted rent increase[s]."

81. A current RealPage Senior Manager of Revenue Management Advisory Services previously was a Leasing Manager at Greystar.

82. A YieldStar Advisor at RealPage was previously a Director of Training at Greystar.

83. An Advisor of Revenue Management Advisory Services at RealPage was previously a Regional Property Manager at Greystar.

84. An AIRM Advisor of Revenue Management Advisory Services at RealPage was previously a Revenue Associate for Business Development at Greystar.

85. A Greystar Operations Trainer and Start-Up Coordinator became a Senior Marketing and Leasing Manager for another property manager before becoming a YieldStar Optimizer Trainer for RealPage, and then a National Training Director and National Director of Training and Marketing for three other property managers, before returning to RealPage as a Business Intelligence Training Program Lead.

CLASS ACTION COMPLAINT
Case No.: 3:23-cv-00331
17

EDELSON PC
350 North LaSalle Street, 14th Floor
Tel: 912 589 6370 • Fax: 312 589 6378

Case 3:23-cv-00331   Document 1   Filed 11/10/22   Page 20 of 48   PageID #: 20

86. A Revenue Management Advisor at RealPage was previously a Regional Manager at Greystar.

87. One individual was a Leasing professional for Greystar before becoming an OnSite Product Support Specialist for RealPage, and then returned to Greystar to serve as an Accounting Manager.

88. A current Development Associate at Greystar was previously a Real Estate Pipeline Development and Research Analyst for a RealPage subsidiary.

89. A current Property Accountant at Greystar was previously an Accountant for RealPage.

90. A current Senior Financial Analyst at Greystar was previously an Enterprise Account Receivable Analyst at RealPage.

91. A current Accounting Manager, Leasing Professional, and Property Accountant at Greystar was previously a Marketing Associate for RealPage.

92. A current Community Manager for Greystar was previously a Client Service Supervisor for RealPage. (And before that, this individual was employed as a Community Manager and Property Manager for Defendant Equity Residential.)

93. A current Manager of Property Conversions for Greystar was previously a Training Coordinator and Implementation Analyst and Services Representative for RealPage.

94. One individual served as a Leasing Consultant for Greystar before becoming an Account Representative at RealPage, and then returned to Greystar.

95. A current Business Systems Analyst at Greystar was previously employed by RealPage.

96. A Client Trainer and Client Success Manager at RealPage later became a Certified Scrum Master and Business System Analyst at Greystar.

97. Greystar's Senior Manager of National Client Marketing and Senior Client Marketing was previously a RealPage Account Manager.

98.     An Assistant Manager for Lincoln later became a LeaseStar Consultant for RealPage, and then a Software Trainer for Greystar.

99.     One of RealPage's Conventional Product Support Agents later became a Greystar employee coordinating RealPage Software Support at Greystar.

100.    One of Greystar's current Senior Business Analysts previously served in the same role at RealPage.

101.    An implementation services representative at RealPage now works as a Property Conversion Coordinator for Greystar.

102.    One of Greystar's System Support Specialists in Washington previously worked for RealPage.

103.    Greystar's Senior Director of Product Development and Global Operating Systems was previously a Director of Product Management at RealPage.

104.    Greystar's Coordinator of Software Support was previously an Implementation Consultant for RealPage.

105.    A RealPage Compliance Specialist was previously a Leasing Professional at Greystar.

106.    A RealPage Account Representative was previously a Greystar Leasing Manager.

107.    A Revenue Management Advisor at RealPage previously worked for Greystar as a Community Manager.

108.    An Account Executive at RealPage was previously a Corporate Trainer and Leasing Manager for Greystar.

109.    A Business Development Representative for RealPage was previously a Greystar Leasing Professional.

110.    A Client Renewal Specialist and Solutions Representative at RealPage was previously a Greystar Leasing Marketing Manager.

111.    An Account Manager at RealPage was previously a Greystar Property Manager.

EDELSON PC
350
Tel: 312 589 6370 • Fax: 312 589 6378

112.    A Senior Vice President at RealPage was previously a Director of Marketing Technology at Greystar.

113.    An Asset Optimization and Property Management Professional at RealPage was previously a Property Manager at Greystar.

114.    A Solutions Consultant and Business Intelligence Consultant at RealPage was previously a Community Manager at Greystar.

115.    One of RealPage's long-time Sales Engineers and current VP of New York, HOA, and International Markets previously worked as an Assistant Community Manager for Greystar.

116.    A Senior Account Manager at RealPage was previously an Assistant Manager and Leasing Sales Manager at Greystar.

117.    A RealPage National Account Executive was previously an Assistant Community Manager at Greystar.

118.    One of RealPage's Compliance Partners was a Leasing Specialist at Greystar.

119.    A RealPage Software Product Trainer was a Community Manager at Greystar.

120.    A Revenue Advisor at RealPage was a Senior Community Manager at Greystar.

121.    A RealPage Training Manager for RealPage Solutions was previously a Leasing Manager at Greystar.

122.    A RealPage Customer Solutions Architect and Account Manager was previously a Property Manager at Greystar.

123.    A current Consultant at RealPage was previously a Greystar Community Manager.

124.    RealPage's Director of Strategic Implementations was previously a Senior Software Training and Support Consultant and Community Manager at Greystar.

125.    A Professional Services Consultant of Revenue Management at RealPage previously worked for Greystar.

126.    A Renewal Specialist and Account Manager at RealPage was previously a Community Manager at Greystar.

EDELSON PC
350 ·······
Tel: 912 589 6370 · Fax: 312 589 6378

127. A Sales Business Development employee at RealPage was previously an Assistant Property Manager and Leasing Professional at Greystar.

128. A National Account Executive for Business Development on Key Accounts at RealPage was previously a Management Analyst at Greystar.

129. A Solutions Account Manager at RealPage was previously an Assistant Leasing Manager at Greystar.

130. A Solution Account Manager for RealPage was previously a Leasing Professional and Marketing Specialist for Greystar.

131. A Manager of Product Success at RealPage was previously an Assistant Community director at Greystar.

132. A RealPage Account Executive was previously a New Construction & Renovations Director at Greystar.

133. A Greystar Software Trainer later became a SuperUser Advisor for RealPage.

134. A Leasing Manager at Greystar later became a RealPage Strategic Planning Advisor and Strategic Development Manager.

### b. **FPI—RealPage**

135. The following are examples of the people who moved between FPI and RealPage.

136. RealPage's Vice President of Client Renewal Management, Vice President of Strategic Development was previously a Regional Property Manager/Trainer at FPI.

137. A Compliance Manager and Corporate Trainer at FPI later became a Compliance Specialist at RealPage before returning to FPI as a Compliance Coordinator.

138. One person was a YieldStar Trainer for RealPage before becoming a Yardi Trainer for FPI, and then returning to RealPage as a Senior Consulting Manager for Business Intelligence.

139. A RealPage Solution Account Manager was a Community Manager for FPI.

EDELSON PC
350 North LaSalle Street, 14th Floor
Chicago, Illinois 60654
Tel: 912 589 6370 • Fax: 312 589 6378

### c. Lincoln—RealPage

140. The following are examples of the dozens of people who moved between Lincoln and RealPage.

141. A Lincoln Senior Vice President and Regional Vice President was previously a Consultant and Vice President for RealPage and an Executive Vice President for Equity Residential.

142. An Advisor for RealPage Revenue Management Advisory Services was previously a Lincoln Leasing Consultant.

143. An Assistant Property Manager and Leasing Consultant for Lincoln later became a Revenue Associate for Greystar and then a Revenue Advisor at RealPage.

144. A RealPage YieldStar Advisor was previously a Lincoln Assistant Property Manager.

145. A RealPage AO Advisor/Revenue Manager was previously a Regional Property Manager at Lincoln.

146. A Revenue Management Advisor at RealPage was previously an On-Site Property Manager and Director of Leasing at Lincoln.

147. A Director of Risk Management at Lincoln was previously a Manager of Corporate Insurance at RealPage.

148. A current Client Success Representative for RealPage previously worked for Lincoln.

149. A Solutions Trainer at RealPage also previously worked for Lincoln.

150. RealPage's Senior Vice President of Spend Management and Accounting and previous Director of Account Management was, before that, a Business Manager at Lincoln.

151. A current RealPage Account and Client Success Manager was previously a Senior Sales Manager for Lincoln.

CLASS ACTION COMPLAINT 22
Case No. 3:23-cv-00331   Document 1   Filed 11/10/22   Page 25 of 48   PageID #: 25

EDELSON PC
350 North LaSalle Street, 14th Floor
Chicago, Illinois 60654
Tel: 312 589 6370 • Fax: 312 589 6378

152. A RealPage Manager of Customer Success who became a Director of Onboarding was previously a Regional Property Manager and Director of Learning and Development at Lincoln.

153. A Lincoln Regional Property Manager became a RealPage Customer Success Manager.

154. An Enterprise Solutions Consultant at RealPage was previously an Assistant Business Manager at Lincoln.

155. A Client Solutions Manager of Market Analytics at RealPage was previously a Property Manager and Assistant Business Manager at Lincoln.

156. An Implementation Consultant at RealPage was previously a Leasing Professional at Lincoln.

157. A Lincoln Property Manager became a RealPage Financial Solutions Consultant.

158. A RealPage Engagement Coordinator was previously an Assistant Property Manager at Lincoln.

159. A RealPage Revenue Management Advisor – AIRM was previously a Revenue Manager and Leasing and Marketing Associate at Lincoln.

160. A Customer Success Manager for Market Analytics at RealPage was previously a Business Manager at Lincoln.

161. A Property Management Solutions Representative at RealPage was previously an Assistant Leasing Manager at Lincoln. This individual is also a Vendor Affiliate and Member of the National Association of Residential Property Managers.

162. A Vice President of Solution Engineering at RealPage was previously a Business Manager at Lincoln.

163. A Director of Product Management at RealPage was previously a Regional Systems Coordinator at Lincoln.

164. An Implementation Consultant at RealPage was previously a Property Manager at Lincoln.

EDELSON PC
350 ... 
Tel: 312 589 6370 • Fax: 312 589 6378

165.    Another Implementation Consultant at RealPage was previously a Leasing Consultant at Lincoln.

### d.    Equity Residential—RealPage

166.    The following are examples of the dozens of people who moved between Equity Residential and RealPage.

167.    A person who was a Regional Manager at Equity Residential left to become a YieldStar Advisor at RealPage, before returning to Equity Residential as a Senior Regional Manager.

168.    Equity Residential's Manager of Pricing and Revenue Management was previously a YieldStar Advisor at RealPage.

169.    A current Revenue Management Advisor for RealPage was previously a General Manager and Leasing Manager at Equity Residential.

170.    One individual was a Manager at Equity Residential before becoming a Revenue Associate Advisor and Manager at Greystar, and ultimately an Industry Principal for RealPage.

171.    A current Revenue Management Consultant for RealPage was previously a Community Manager for Greystar and an Assistant Property Manager and Leasing Consultant for Equity Residential.

172.    A current RealPage Strategic Performance Advisor and Vice President of Product Management was previously a General Manager for Equity Residential.

173.    A current Director of Program Management for RealPage was previously a Business Manager and Residential Financial Specialist for Equity Residential.

174.    A current Revenue Management Advisor for RealPage used to be a Leasing Director for Equity Residential.

175.    A previous Multi-Site Manager for Equity Residential is now a Revenue Management Advisor for RealPage.

176.    A current Senior AR Manager for RealPage previously worked for Equity Residential.

EDELSON PC
350 N LaSalle Street, 14th Floor
Chicago, Illinois 60654
Tel: 312.589.6370 • Fax: 312.589.6378

177.     A current Revenue Management Advisor for RealPage used to work for Equity Residential.

178.     A current Senior Manager for RealPage was previously a Leasing Consultant for Equity Residential and for other property management companies.

179.     A current AIRM Advisor of Revenue Management Advisory Services for RealPage previously was a Leasing Director for Equity Residential.

180.     A Senior Director of Customer Success for RealPage was previously a Project Manager for Equity Residential.

181.     A current Solution Consultant for RealPage was previously a Property Manager and General Manager for Equity Residential.

182.     A former Property Manager for Equity Residential is now a Senior Solution Engineer for RealPage.

183.      Another Solution Engineer at RealPage was previously a Leasing Director and Assistant Property Manager for Equity Residential.

### e.     MAAC—RealPage

184.     The following are examples of the dozens of people who moved between MAAC and RealPage.

185.     A current Regional Sales and Revenue Director for MAAC was previously a National Account Representative and Customer Success Architect for RealPage.

186.     A Regional Property Manager at MAAC was previously a Professional Trainer at RealPage.

187.     A current Solutions Consultant at RealPage was previously a Support Manager for MAAC.

188.     A current Business Intelligence Consultant for RealPage was previously a Leasing Consultant for MAAC.

189.     An Engagement Manager for RealPage was previously a Property Manager for MAAC.

EDELSON PC
350 North LaSalle Street, 14th Floor
Chicago, Illinois 60654
Tel: 312.589.6370 • Fax: 312.589.6378

190. One of RealPage's current National Account Managers was previously a Multi-Property Leasing Consultant for MAAC.

**f.     Essex—RealPage**

191. The following are examples of the dozens of people who moved between Essex and RealPage.

192. A current RealPage AIRM Revenue Management Advisor was previously a Property Manager at Greystar and also Essex. This individual boasted that in their role as a Property Manager at Essex they were "responsible for post lease up rent increases and renewal management" and successfully "achieved 7% budgeted rent increase[s]."

193. A Performance Advisor for Revenue Management Advisory Services at RealPage was previously a Community Manager at Essex.

194. One of RealPage's Customer Success Managers was previously a Community Manager at Essex.

**g.     AvalonBay—RealPage**

195. The following are examples of the many people who moved between AvalonBay and RealPage.

196. An Asset Optimization employee and a member of the AI Revenue Management Team at RealPage was previously an Assistant Property Manager at AvalonBay.

197. A Senior Revenue Manager and Pricing Analyst at RealPage was previously a Senior Community Manager at AvalonBay.

198. An Emerging Markets Consultant at RealPage was previously in Property Management at AvalonBay.

199. An Implementation Consultant at RealPage was previously a Community Consultant at AvalonBay.

200. A Senior Compliance Advocate at RealPage was previously an Assistant Community Manager at AvalonBay.

EDELSON PC
350 North LaSalle Street, 14th Floor
Tel: 912 589 6370 • Fax: 312 589 6378

201. A Senior Manager in Customer Success at RealPage was previously a Senior Leasing Representative at AvalonBay and a Leasing Consultant at Equity Residential.

202. An LRO Advisor at RealPage was previously a Customer Service Supervisor at AvalonBay.

203. A Vice President of Customer Success at RealPage was previously a Portfolio Manager at AvalonBay.

204. A Revenue Manager at RealPage was previously an Assistant Manager at AvalonBay.

### h. Camden Property Trust—RealPage

205. The following are examples of the dozens of people who moved between Camden and RealPage.

206. A Revenue Management Advisor at RealPage was previously a Senior Community Manager at Camden. This person boasts they "increased rates by strategically staggering move-outs around school schedules, limiting lease expirations in May," and that they "consistently met performance goals like rent growth." These "successes" led to their selection as the representative of Arizona on "a national committee." While at Camden, they also "worked with software and companies such as RealPage . . . [and] YieldStar."

207. A YieldStar Consultant at RealPage was previously a Regional Manager at Camden.

208. An Advisor for YieldStar Advisory Services at RealPage was previously a Regional Manager at Camden.

209. A Manager in Development at Camden was previously a Sales Development Representative at RealPage.

210. An Information Technology Project Manager at Camden was previously a Senior Project Manager at RealPage.

211. A Revenue Management Analyst in YieldStar Advisory Services at RealPage was previously a Consultant at Camden.

CLASS ACTION COMPLAINT
Case No.

27

EDELSON PC
350 North LaSalle Street, 14th Floor
Chicago, Illinois 60654
Tel: 312 589 6370 • Fax: 312 589 6378

212. A Solutions Engineer at RealPage was previously an Assistant Sales Manager at Camden.

213. A Strategic Performance Advisor and former Vice President I and II at RealPage was previously a District Manager at Camden and a General Manager at Equity Residential.

214. A Development Analyst for YieldStar Implementations at RealPage was previously a Senior Software Support Specialist at Camden.

215. A Strategic Performance Advisor and former Manager of YieldStar Advisory Services at RealPage was previously a Community Manager at Camden.

216. A Director of Strategic Implementations at RealPage was previously a Regional Manager at Camden.

217. A Project Manager at RealPage was previously an Administrative Assistant at Camden.

218. A Client Trainer at RealPage was previously an Assistant Manager at Camden.

219. A Senior Integration Consultant for RealPage Exchange at RealPage was previously a Director of Business Services at Camden.

220. A Customer Solutions Architect Senior Manager at RealPage was previously a Business Support Center Manager at Camden.

221. A Client Trainer at RealPage was previously a Community Manager at Camden.

222. A Customer Success Manager at RealPage was previously employed at Camden.

223. A Client Solutions Training Team Lead at RealPage was previously an Assistant Community Manager and Leasing Sponsor at Camden.

224. A Strategic Business Advisor at RealPage was previously a District Manager at the end of a 15-year stint at Camden.

225. A Performance Advisor for Revenue Advisory Services at RealPage was previously a Community Manager at Camden and Essex.

226. A Product Management Senior Manager at RealPage was previously a Problem Management Specialist at Camden.

227. An Implementation Project Manager at RealPage was previously an Assistant Community Manager at Camden.

228. A Project Manager at RealPage was previously employed by Camden.

229. A Strategic Performance Advisory Director at RealPage was previously a Business Services Director at Camden.

230. A Customer Solutions Architect at RealPage was previously a Leasing Consultant at Camden.

### 8. The Regular Meetings of Trade Associations and Other Networking Tools Confirm Numerous Opportunities to Conspire

231. The highly-networked nature of the industry is also confirmed by the existence of numerous trade associations at the local, regional, and national levels, and frequent meetings and events involving representatives of RealPage, the Lessor Defendants, and their competitors.

#### a. RealPage's RealWorld Conference and Summits

232. RealPage hosts an annual multi-day conference with over 1,000 attendees called "RealWorld" all over the country.

233. RealWorld 2014 was in Chicago, Illinois.

234. RealWorld 2015, with more than 1,200 attendees, was held in San Diego, California.

235. RealWorld 2016, 2017, and 2018 were held in Las Vegas, Nevada.

236. At RealWorld 2018, there was a session on the morning of Tuesday, July 17 that discussed growing revenue at your property management company through the use of RealPage's pricing algorithms.

237. RealWorld 2019 was held in Orlando, Florida and had a specific focus on RealPage's new Market Analytics, which their blog boasted "provides more data and direction for clients through RealPage's vast collection of transaction data from more than 13 million apartment units, down to the submarket level."

238. After a virtual 2020 conference that included information on Revenue Management, Market Analytics, and "Unlimited Virtual Networking," RealWorld 2021 was held in Nashville, Tennessee and was titled "RealWorld 2021, The Yield Awakens."

239. At the 2022 RealWorld event in Las Vegas, Nevada, over 1,500 attendees came together. RealPage's CEO emphasized that "RealPage will continue to be relentless in helping customers achieve peak performance . . . by building connected intelligence and using AI to optimize not just rent but the entire prospect-to-resident journey, and to dynamically link marketing, leasing, and pricing so they'll working [sic] cohesively to deliver optimized outcomes."

240. RealPage also regularly hosts "summits" for the Lessors to discuss its pricing software. The topics include (1) "Competitive Rent Analysis," or "[m]ethods of establishing and maintaining amenity-based prices for each unit and floor plan, factoring in comparable peer pricing," (2) "Supply Forecasts and "Demand Forecasts," and (3) RealPage's "Pricing Engine," "or "[m]ethods to price units in real time based on statistically validated price elasticity models."

### b. RealPage User Group and Steering Committee

241. RealPage also actively organizes property managers to facilitate cross-competitor connections and relationships. For example, on its website, RealPage hosts a RealPage User Group. The User Group was formed in 2003 with 10 members, but has now grown to "over 1000 active members," according to RealPage. As RealPage explains, the user community "promote[s] communications between users" and "provides a unique opportunity to exchange ideas, address issues, and explore solutions to meet the changing needs of users."

242. RealPage also organizes a Steering Committee for its User Group. The Steering Committee is responsible for leadership of the User Group Subcommittees, and includes 2 offices, a chair for each subcommittee, and numerous RealPage product experts. There are subcommittees for: Accounting, Affordable Compliance, Business Intelligence/Performance Analytics, Energy & Utility Management, Learning, Leasing Solutions, Marketing Solutions, Property Management Systems, Resident Services, Revenue Management, Screening, and Spend

EDELSON PC
350 ... 
Tel: 912 589 6370 • Fax: 312 589 6378

Management Facilities & Purchasing. Participation in the Steering Committee is noteworthy: employees of the Lessor Defendants, for example, list such participation on their resumés or professional profiles.

243. The subcommittees hold quarterly calls and meet in-person at the annual RealWorld conference. The purpose of these regular meetings is for members to "discuss issues with other members." Indeed, subcommittee membership requires active participation in meetings with competitors. RealPage estimates that duties related to subcommittee membership may take at least 5 hours per month. To become a subcommittee member, a participant must agree to the terms of membership outlined in the Subcommittee Charter, which provides that: "In order to be approved for membership on a subcommittee, a client—as well as his or her company—must agree to the following terms: Attend one annual meeting to be held during the RealWorld conference; Participate in one conference call per quarter; . . . Serve a two-year term; [and] Use the product or service of the subcommittee you want to join."

244. Subcommittee members are eligible for election to the Steering Committee after serving one year on a committee, and are typically employees of major property management companies that would otherwise be competitors. For example, Alaina Emily, Greystar's Managing Director of Revenue Management, currently sits on RealPage's Steering Committee.

### c. National Multifamily Housing Council

245. The National Multifamily Housing Council (NMHC) calls itself "the place where the leaders of the apartment industry come together to guide their future success." It holds several events every year, including an "Apartment Strategy Conference," an "Annual Meeting," and a "Fall Meeting." The events are hosted in cities like San Diego, Las Vegas, and Washington, D.C.

246. RealPage and many of the Lessor Defendants, including Greystar, Avenue5, Camden, Equity Residential, Lincoln, and MAAC are sponsors of the NMHC at the Chair's Circle and Friends of the Council Level.

CLASS ACTION COMPLAINT
Case No.

34

EDELSON PC
350 N. LaSalle St., 14th Floor
Chicago, IL 60654
Tel: 312 589 6370 · Fax: 312 589 6378

247. NMHC also helps its members share their pricing data with one another by conducting member surveys and other market research to establish "industry benchmarks" on issues like "In Place Rent Per Square Foot," "Rent Change – New Leases," and "Rent Change – Renewals."

248. RealPage ran an exhibition at and was a Platinum Sponsor of the NMHC OPTECH Conference & Expo held November 1-3, 2022 in Las Vegas.

249. NMHC Members get special perks at their conferences. For example, at the NMHC OPTECH Conference & Expo, Executive Committee Members received 3 comp registrations, Board of Directors Members received 1 comp registration, and paid registrations for members and sponsors (including Advisory Committee Members) were $600 less per participant than for non-members. These kinds of perks confirm that representatives of the Lessor Defendants regularly meet with one another at NMHC events.

250. All of the Defendants are members and supporters of NMHC. For example, Greystar, Lincoln, Equity Residential, MAAC, AvalonBay, and Camden are all members at the invitation-only Executive Committee level. RealPage and Avenue5 are members at the Board of Directors level. FPI, Essex, Thrive Communities, and Security Properties are all members at the Advisory Committee level.

251. Executive Committee Members of the NMHC, such as Greystar, Lincoln, Equity Residential, MAAC, AvalonBay, and Camden, can attend three peer-to-peer roundtables per year.

252. The NMHC says that a portion of Membership dues "may be deductible as a business expense *or a expense incurred in the production of income*" (emphasis added), implying that the goal of NMHC membership is, at least in part, to increase the profitability of its member companies. Thus, pricing strategies are likely discussed at NMHC events.

### d.    Other Trade Associations

253. The Lessor Defendants have opportunities to conspire through various other trade association activities, too. For example, FPI, Greystar, and Equity Residential all have

CLASS ACTION COMPLAINT                                     32

**EDELSON PC**
350 North LaSalle Street, 14th Floor
Chicago, Illinois 60654
Tel: 312.589.6370 • Fax: 312.589.6378

Case 3:23-cv-00331    Document 1    Filed 11/10/22    Page 35 of 48    PageID #: 35

employees serving as officers of the California Apartment Association. FPI's Cynthia Wray, the Senior Director of Acquisitions, serves as the CAA Board's President-Elect. Greystar's Bradley M. Johnson, a Senior Managing Director of US West Real Estate Services, serves as the CAA Board's Vice President. Equity Residential's Executive Vice President, Barry Altshuler, is the CAA Board's immediate past president. Several other trade associations also exist to organize the interests of property managers around the country, and to facilitate cross-competitor connections and communications, including but not limited to the National Association of Residential Property Managers, the Building Owners and Managers Association, and the Institute of Real Estate Management.

**D.** **Additional Defendant-Specific Allegations**

    **1.** **Greystar Real Estate Partners, LLC**

254. <u>Overview</u>: Greystar is the nation's largest property management firm and fifth-largest property owner. It has deployed RealPage's pricing algorithm to price tens of thousands of apartments. It controls hundreds of buildings in numerous metropolitan areas where rents have risen steeply in recent years. Nationwide, Greystar manages approximately 700,000 multifamily units, and owns approximately 80,000 units.

255. <u>Trade Association Participation</u>: Greystar is a member of the California Apartment Association (CAA). Its Senior Managing Director, Bradley Johnson, serves as the Vice President of CAA's Board. Mr. Johnson leads real estate operations for Greystar's West Division, overseeing a multifamily portfolio of over 100,000 active units within California and Hawaii. He is a frequent participant at industry events. Greystar is also a Chair's Circle sponsor of the NMHC and a NMHC Executive Committee member. As an Executive Committee member, Greystar gets multiple complimentary and additional subsidized registrants at all NMHC conferences and participates in exclusive peer-to-peer roundtables, confirming regular attendance at such events by its employees. Finally, Greystar is actively involved in various RealPage events and committees intended to facilitate cross-competitor connections, as discussed above.

CLASS ACTION COMPLAINT
Case No.

**EDELSON PC**
350 N. LaSalle Street, 14th Floor, Chicago, IL 60654
Tel: 312.589.6370 • Fax: 312.589.6378

Case 3:23-cv-00331   Document 1   Filed 11/10/22   Page 36 of 48   PageID #: 36

256. <u>Use of AIRM</u>:  Greystar utilizes RealPage's pricing algorithm in many of its buildings.  To use RealPage's pricing algorithm, Greystar agreed to share otherwise private and competitively-sensitive unit-level data regarding pricing and occupancy, including to benefit its competitors.

257. <u>Economic Plus Factors</u>:  The plus factors described above apply to Greystar's sale of leases for multifamily residential housing.

## 2. **Lincoln Property Company**

258. <u>Overview</u>: Lincoln manages dozens of buildings and over 200,000 units in high-growth markets around the country, including but not limited to Alabama, Arizona, Colorado, Connecticut, Delaware, Florida, Georgia, Illinois, Indiana, Kansas, Kentucky, Louisiana, Maryland, Massachusetts, Minnesota, Missouri, New Jersey, New York, North Carolina, Ohio, Oklahoma, Pennsylvania, Rhode Island, South Carolina, Tennessee, Texas, Virginia, Washington, Washington D.C., and Wisconsin.  It utilizes RealPage's pricing algorithm in many of its buildings.

259. <u>Trade Association Participation</u>: Lincoln is a Friends of the Council level sponsor and an Executive Committee member of the NMHC.  As an Executive Committee member, Lincoln gets multiple complimentary and additional subsidized registrants at all NMHC conferences and participates in exclusive peer-to-peer roundtables.

260. <u>Use of AIRM</u>:  Lincoln utilizes RealPage's pricing algorithm in many of its buildings.  To use RealPage's pricing algorithm, Lincoln agreed to share otherwise private and competitively-sensitive unit-level data regarding pricing and occupancy, including to benefit its competitors.

261. <u>Economic Plus Factors</u>:  The plus factors described above apply to Lincoln's sale of leases for multifamily residential housing.

## 3. **FPI Management, Inc.**

262. <u>Overview</u>: FPI controls hundreds of buildings in metropolitan areas where rents have risen steeply in recent years.  It is the fifth largest property manager in the country,

**EDELSON PC**
350 N. LaSalle Street, 14th Floor
Tel: 312.589.6370 • Fax: 312.589.6378

24

managing approximately 150,000 units in approximately 17 states, including Washington, Oregon, Idaho, Montana, Nevada, California, New Mexico, Oklahoma, Texas, Alaska, Louisiana, Minnesota, Ohio, Virginia, Georgia, Florida, and Arizona. It utilizes RealPage's pricing algorithm in many of its buildings.

263. <u>Trade Association Participation</u>: FPI's Cynthia Wray, the Senior Director of Acquisitions, serves as the CAA Board's President-Elect. FPI is an Advisory Committee member of the NMHC, which allows complimentary registration at some and subsidized registration at most NMHC meetings, confirming that FPI representatives regularly attend such events.

264. <u>Use of AIRM</u>: FPI utilizes RealPage's pricing algorithm in many of its buildings. To use RealPage's pricing algorithm, FPI agreed to share otherwise private and competitively-sensitive unit-level data regarding pricing and occupancy, including to benefit its competitors.

265. <u>Economic Plus Factors</u>: The plus factors described above apply to FPI's sale of leases for multifamily residential housing.

### 4. **Mid-America Apartment Communities, Inc.**

266. <u>Overview</u>: MAAC owns and manages dozens of buildings, including over 100,000 apartment units, in high-growth markets around the country. It is the second-largest owner of apartment units in the country, and tenth-largest property manager. It operates in Alabama, Arizona, Colorado, the District of Columbia, Florida, Georgia, Kansas, Kentucky, Maryland, Missouri, Nevada, North Carolina, South Carolina, Tennessee, Texas, and Virginia. It utilizes RealPage's pricing algorithm in many of its buildings.

267. <u>Trade Association Participation</u>: MAAC is a Friends of the Council level sponsor and an Executive Committee member of the NMHC. As an Executive Committee member, MAAC gets multiple complimentary and additional subsidized registrants at all NMHC conferences and participates in exclusive peer-to-peer roundtables.

268. <u>Use of AIRM</u>: MAAC utilizes RealPage's pricing algorithm in many of its buildings. To use RealPage's pricing algorithm, MAAC agreed to share otherwise private and

CLASS ACTION COMPLAINT
Case No.

35

**EDELSON PC**
350 N. LaSalle Street, 14th Floor, Chicago, IL 60654
Tel: 312 589 6370 · Fax: 312 589 6378

Case 3:23-cv-00331   Document 1   Filed 11/10/22   Page 38 of 48   PageID #: 38

competitively-sensitive unit-level data regarding pricing and occupancy, including to benefit its competitors.

269. <u>Economic Plus Factors</u>: The plus factors described above apply to MAAC's sale of leases for multifamily residential housing.

### 5. **Avenue5 Residential, LLC**

270. <u>Overview</u>: Avenue5 is one of the top 15 property managers in the country, with over 85,000 units under its control across the country, including in Washington, Oregon, California, Montana, Idaho, Nevada, Utah, Arizona, Wyoming, Colorado, Texas, Georgia, Virginia, North Carolina, South Carolina, Maryland, Pennsylvania, Florida, and the District of Columbia. It utilizes RealPage's pricing algorithm in many of its buildings.

271. <u>Trade Association Participation</u>: Avenue5 is a Friends of the Council level sponsor and a Board of Directors member of the NMHC. As a member of the Board of Directors, Avenue5 gets 1-3 complimentary and additional subsidized registrants at all NMHC conferences, confirming its regular attendance at such meetings.

272. <u>Use of AIRM</u>: Avenue5 utilizes RealPage's pricing algorithm in many of its buildings. To use RealPage's pricing algorithm, Avenue5 agreed to share otherwise private and competitively-sensitive unit-level data regarding pricing and occupancy, including to benefit its competitors.

273. <u>Economic Plus Factors</u>: The plus factors described above apply to Avenue5's sale of leases for multifamily residential housing.

### 6. **Equity Residential**

274. <u>Overview</u>: Equity Residential manages dozens of buildings, nearly 80,000 units, in high-growth housing markets around the country, including but not limited to New York, Washington, D.C., San Francisco, Los Angeles, Boston, Seattle, San Diego, California's Orange County and Inland Empire, Denver, Austin, and Dallas. It is the 5th largest owner of apartments in the United States and the 16th largest apartment property manager. It utilizes RealPage's pricing algorithm in many of its buildings.

CLASS ACTION COMPLAINT
Case No.
36

EDELSON PC
350 North LaSalle Street, 14th Floor
Chicago, Illinois 60654
Tel: 312 589 6370 • Fax: 312 589 6378

Case 3:23-cv-00331   Document 1   Filed 11/10/22   Page 39 of 48   PageID #: 39

275. <u>Trade Association Participation</u>:  Equity Residential is a Friends of the Council level sponsor and an Executive Committee member of the NMHC.  As an Executive Committee member, Equity Residential gets multiple complimentary and additional subsidized registrants at all NMHC conferences and participates in exclusive peer-to-peer roundtables.

276. <u>Use of AIRM</u>:  Equity Residential utilizes RealPage's pricing algorithm in many of its buildings.  To use RealPage's pricing algorithm, Equity Residential agreed to share otherwise private and competitively-sensitive unit-level data regarding pricing and occupancy, including to benefit its competitors.

277. <u>Economic Plus Factors</u>:  The plus factors described above apply to Equity Residential's sale of leases for multifamily residential housing.

### 7. **Essex Property Trust, Inc. and Essex Management Corporation**

278. <u>Overview</u>:  Essex owns and manages over 60,000 apartment units around the country, with operations in major housing markets like San Francisco, Los Angeles, Orange County, San Diego, Santa Barbara, Ventura County, and Seattle.  It has utilized RealPage's pricing algorithms in its buildings since at least 2008.

279. <u>Trade Association Participation</u>:  Essex is an Advisory Committee member of the NMHC, which allows complimentary registration at some and subsidized registration at most NMHC meetings.

280. <u>Use of AIRM</u>:  Essex utilizes RealPage's pricing algorithm in many of its buildings.  To use RealPage's pricing algorithm, Essex agreed to share otherwise private and competitively-sensitive unit-level data regarding pricing and occupancy, including to benefit its competitors.

281. <u>Economic Plus Factors</u>:  The plus factors described above apply to Essex's sale of leases for multifamily residential housing.

### 8. Thrive Communities Management, LLC

282.  Overview: Thrive Communities is a boutique property manager operating in Washington and Oregon.

283.  Trade Association Participation: Thrive Communities is an Advisory Committee member of the NMHC, which allows complimentary registration at some and subsidized registration at most NMHC meetings, confirming its regular attendance at such meetings.

284.  Use of AIRM: Thrive Communities utilizes RealPage's pricing algorithm in many of its buildings. To use RealPage's pricing algorithm, Thrive Communities agreed to share otherwise private and competitively-sensitive unit-level data regarding pricing and occupancy, including to benefit its competitors.

285.  Economic Plus Factors: The plus factors described above apply to Thrive Communities' sale of leases for multifamily residential housing.

### 9. Security Properties, Inc.

286.  Overview: Security Properties and its partners have invested over $2 billion in multifamily real estate. Their portfolio, valued at nearly $5.9 billion, includes 113 properties and over 22,000 multifamily housing units all over the country, including the State of Washington.

287.  Trade Association Participation: Security Properties is an Advisory Committee member of the NMHC, which allows complimentary registration at some and subsidized registration at most NMHC meetings, confirming its regular attendance at such trade association events.

288.  Use of AIRM: Security Properties utilizes RealPage's pricing algorithm in many of its buildings. To use RealPage's pricing algorithm, Security Properties agreed to share otherwise private and competitively-sensitive unit-level data regarding pricing and occupancy, including to benefit its competitors.

289.  Economic Plus Factors: The plus factors described above apply to Security Properties' sale of leases for multifamily residential housing.

# V.    CLASS ALLEGATIONS

290.    **Class Definition:** Plaintiffs Alvarez and Halliwell bring this action pursuant to Federal Rule of Civil Procedure 23(b)(2) and 23(b)(3) on behalf of themselves and a Class defined as follows:

> All persons or entities who signed a lease for a multifamily residential housing unit from a Lessor using RealPage's pricing or lease renewal software programs or from a division, subsidiary, predecessor, agent, or affiliate of such Lessor using such software, and made payments pursuant to such a lease, at any time since January 1, 2016.

Excluded from the Class are: (1) any Judge or Magistrate presiding over this action and members of their families; (2) Defendants, Defendants' subsidiaries, parents, successors, predecessors, and any entity in which the Defendants or their parents have a controlling interest and their current or former employees, officers and directors; (3) persons who properly execute and file a timely request for exclusion from the Class; (4) persons whose claims in this matter have been finally adjudicated on the merits or otherwise released; (5) Plaintiffs' counsel and Defendants' counsel; and (6) the legal representatives, successors, and assigns of any such excluded persons.

291.    **Ascertainability and Numerosity**: The exact number of Class members is unknown and not available to Plaintiffs at this time, but it is clear that individual joinder is impracticable.  Defendants operate hundreds of thousands of rental units utilizing RealPage's pricing and lease renewal software.  Additionally, the Class is ascertainable because its members will be easily identified through Defendants' records.

292.    **Commonality and Predominance**: There are many questions of law and fact common to the claims of Plaintiffs and the proposed Class, and those questions predominate over any questions that may affect individual members of the Class.  Common questions for the Class include, but are not necessarily limited to the following:

a.    Whether Defendants entered into an agreement in restraint of trade;

b.    Whether Defendants' agreement caused anticompetitive harm to

**EDELSON PC**
350 N. LaSalle Street, 14th Floor, Chicago, Illinois 60654
Tel: 312.589.6370 • Fax: 312.589.6378

Plaintiffs and members of the proposed Class;

c.    Whether the lawfulness of Defendants' conduct should be adjudged under the *per se*, quick look, or rule of reason tests;

d.    Whether Plaintiffs and members of the proposed Class are entitled to damages and, if so, in what amount;

e.    Whether Plaintiffs and members of the proposed Class are entitled to injunctive relief, and if so, what.

293.    **Typicality**: Plaintiffs' claims are typical of the claims of other members of the Class, in that Plaintiffs and the Class members sustained damages arising out of Defendants' uniform wrongful conduct.

294.    **Adequate Representation**: Plaintiffs will fairly and adequately represent and protect the interests of the Class and has retained counsel competent and experienced in complex class actions. Plaintiffs have no interests antagonistic to those of the Class, and Defendants have no defense unique to Plaintiffs.

295.    **Policies Generally Applicable to the Classes**: This class action is appropriate for certification because Defendants have acted or refused to act on grounds generally applicable to the Class as a whole, thereby requiring the Court's imposition of uniform relief to ensure compatible standards of conduct toward the members of the Class and making final injunctive relief appropriate with respect to the Class as a whole. Defendants' policies challenged herein apply and affect members of the Class uniformly and Plaintiffs' challenge of these policies hinges on Defendants' conduct with respect to the Class as a whole, not on facts or law applicable only to Plaintiffs. Plaintiffs and the members of the Class have suffered harm and damages as a result of Defendants' unlawful and wrongful conduct.

296.    **Superiority**: This case is also appropriate for class certification because class proceedings are superior to all other available methods for the fair and efficient adjudication of this controversy because joinder of all parties is impracticable. The damages suffered by the individual members of the Class will likely be relatively small, especially given the burden and

EDELSON PC
350 ... 
Tel: 912 589 6370 • Fax: 312 589 6378

expense of individual prosecution of the complex litigation necessitated by Defendants' actions. Thus, it would be virtually impossible for the individual members of the Class to obtain effective relief from Defendants' misconduct. Even if members of the Class could sustain such individual litigation, it would still not be preferable to a class action, because individual litigation would increase the delay and expense to all parties due to the complex legal and factual controversies presented in this Complaint. By contrast, a class action presents far fewer management difficulties and provides the benefits of single adjudication, economies of scale, and comprehensive supervision by a single Court. Economies of time, effort and expense will be fostered and uniformity of decisions ensured.

## COUNT I
### Violation of Section 1 of the Sherman Act for Agreement in Restraint of Trade
### 15 U.S.C. §§ 1, *et seq.*
### (On behalf of Plaintiffs and the proposed Class)

297. Plaintiffs Alvarez and Halliwell incorporate by reference all previous paragraphs of this Complaint.

298. Defendants, directly and through their divisions, subsidiaries, agents, and affiliates, engage in interstate commerce in the sale of multifamily residential real estate leases.

299. Defendant RealPage orchestrated, and all Defendants entered into and engaged in an unlawful contract, combination, or agreement, in restraint of trade and commerce in violation of the Sherman Act, 15 U.S.C. § 1.

300. Specifically, Defendants combined to coordinate multifamily residential housing rental prices and supply across the United States, and exchanged non-public and competitively-sensitive information with one another in order to accomplish that purpose.

301. Defendants' conduct was undertaken with the intent, purpose, and effect of artificially inflating rental prices above the competitive level, including through manipulation of housing supply; eliminating or constraining price competition between and among the Lessor Defendants with respect to leases for their multifamily residential housing stock; and

EDELSON PC
350 N. LaSalle Street, 14th Floor, Chicago, IL 60654
Tel: 312.589.6370 · Fax: 312.589.6378

1    coordinating the supply of multifamily residential housing between and amongst the Lessor

2    Defendants.

3        302.    Defendants perpetrated this scheme with the specific intent of increasing rental

4    prices for their own benefit.

5        303.    Defendants' conduct in furtherance of the unlawful scheme described herein was

6    authorized, ordered, or executed by their officers, directors, agents, employees, or representatives

7    while actively engaging in the management of Defendants' affairs.

8        304.    Defendants actively concealed their misconduct, including their agreements and

9    the extent to which they share non-public, competitively sensitive and real-time pricing and

10   supply information with one another.  Plaintiffs and the proposed Class had neither actual nor

11   constructive knowledge of Defendants' misconduct, and they did not nor could have discovered

12   such misconduct through the exercise of reasonable diligence.  Defendants' conduct did not

13   reveal facts that would put Plaintiffs or members of the Class on notice that they were

14   participating in an anticompetitive agreement related to the market for multifamily residential

15   housing, nor that they were secretly sharing their private pricing and supply information with one

16   another for the purpose of raising rent prices.  Plaintiffs and members of the proposed Class

17   could not have learned of Defendants' conduct prior to the publication of an exposé in

18   ProPublica in October 2022 revealing Defendants' conduct.  Moreover, Defendants'

19   relationships with one another and with RealPage, including their use of the RealPage algorithm,

20   was concealed from Plaintiffs and the proposed Class.  A reasonable person in these

21   circumstances would not have had reason to suspect that Defendants' rental prices were the

22   product of unlawful conduct.

23       305.    Plaintiffs and the members of the proposed Class have all paid higher prices for

24   their multifamily residential housing leases than they otherwise would have paid in the absence

25   of Defendants' unlawful conduct and, as a result, have been injured in their property and have

26   suffered damages in an amount according to proof at trial.

27

EDELSON PC
350
Tel: 312 589 6370 • Fax: 312 589 6378

306.     Defendants' scheme is unlawful under either the *per se*, quick look, or rule of reason tests. Defendants' conduct in fixing prices and supply, and exchanging real-time and competitively sensitive unit-level pricing and occupancy data, has no procompetitive justifications and is not reasonably necessary to achieve any valid procompetitive purpose. Even if there were some plausible procompetitive purpose for Defendants' scheme, the same purpose could have been achieved without the scheme in question or its anticompetitive effects.

307.     As a direct and proximate result of Defendants' unlawful scheme, Plaintiffs and the members of the proposed Class have suffered injury to their business or property and will continue to suffer economic injury and deprivation of the benefit of free and fair competition unless Defendants' conduct is enjoined.

308.     Plaintiffs and the Class are entitled to recover three times the damages sustained by them, interest on those damages, together with reasonable attorney's fees and costs under Section 4 of the Clayton Act, 15 U.S.C. § 15.

309.     Plaintiffs and the Class are entitled to a permanent injunction that terminates the unlawful conduct alleged herein, as well as any other equitable relief the Court deems proper.

## VI.     PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs, individually and on behalf of the Class, pray that the Court enter an Order:

a. Certifying this case as a class action as defined above, appointing Plaintiffs Alvarez and Halliwell as Class Representatives, and appointing their attorneys as Class Counsel;

b. Declaring that Defendants' actions described herein constitute a violation of the Sherman Act;

c. Awarding injunctive and other equitable relief as necessary to protect the interest of the Class, including, *inter alia*, an order prohibiting Defendants from engaging in the wrongful and unlawful acts described herein;

d. Awarding Plaintiffs and the Class damages in an amount according to

CLASS ACTION COMPLAINT                42

EDELSON PC
350 North LaSalle Street, 14th Floor
Chicago, IL 60654
Tel: 312 589 6370 • Fax: 312 589 6378

Case 3:23-cv-00331    Document 1    Filed 11/10/22    Page 46 of 48    PageID #: 46

1    proof against Defendants for Defendants' violations of the Sherman Act,

2        to be trebled;

3    e.    Awarding Plaintiffs and the Class their reasonable litigation expenses and

4        attorneys' fees;

5    f.    Awarding Plaintiffs and the Class pre- and post-judgment interest; and

6    g.    Granting such other and further relief as the Court deems equitable and

7        just.

8                    **VII.    JURY TRIAL DEMANDED**

9        Plaintiffs demand a trial by jury, pursuant to Rule 38(b) of the Federal Rules of Civil

10   Procedure, of all issues so triable.

11

12                        Respectfully submitted,

13                        **MATTHEW ALVAREZ AND SCOTT
                         HALLIWELL**, individually and on behalf of all
14                        others similarly situated,

15   Dated: November 10, 2022        By: */s/ Alexander G. Tievsky*
                                One of Plaintiffs' Attorneys
16

17                        Jay Edelson (*pro hac vice* forthcoming)
                         jedelson@edelson.com
18                        Benjamin H. Richman (*pro hac vice* forthcoming)
                         brichman@edelson.com
19                        David Mindell (*pro hac vice* forthcoming)
                         dmindell@edelson.com
20                        Alexander G. Tievsky (WSBA #57125)
                         atievsky@edelson.com
21                        **EDELSON PC**
                         350 N. LaSalle Street, 14th Floor
22                        Chicago, Illinois 60654
                         Tel: (312) 589.6370
23                        Fax: (312) 589.6378

24                        Rafey Balabanian (*pro hac vice* forthcoming)
                         rbalabanian@edelson.com
25                        Todd Logan (*pro hac vice* forthcoming)
                         tlogan@edelson.com
26                        Yaman Salahi (*pro hac vice* forthcoming)
                         ysalahi@edelson.com
27                        P. Solange Hilfinger-Pardo (*pro hac vice*
                         forthcoming)

CLASS ACTION COMPLAINT
Case No.

44

EDELSON PC
350 N. LaSalle Street, 14th Floor
Chicago, Illinois 60654
Tel: 312 589 6370 • Fax: 312 589 6378

shilfingerpardo@edelson.com
**EDELSON PC**
150 California Street, 18th Floor
San Francisco, California 94111
Tel: (415) 212.9300
Fax: (415) 373.9435

*Counsel for Individual and Representative Plaintiffs*
*Matthew Alvarez and Scott Halliwell*