UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | |
|---|---|
| IN RE: REALPAGE, INC., RENTAL SOFTWARE ANTITRUST LITIGATION (NO. II) | Case No. 3:23-MD-3071<br>MDL No. 3071<br><br>This Document Relates to:<br>ALL CASES<br><br>Chief Judge Waverly D. Crenshaw, Jr. |

**CERTAIN DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT OF
MOTION TO DISMISS FOR FAILURE TO PLEAD AGENCY LIABILITY**

## TABLE OF CONTENTS

INTRODUCTION ...........................................................................................................................1

LEGAL STANDARD....................................................................................................................2

ARGUMENT .................................................................................................................................4

    I.    THE SAMC DOES NOT PLAUSIBLY ALLEGE THAT THE PROPERTY MANAGEMENT DEFENDANTS DIRECTLY PARTICIPATED IN THE ALLEGED CONSPIRACY TO USE REALPAGE REVENUE MANAGEMENT SOFTWARE AND FOLLOW ITS RENT RECOMMENDATIONS ...........................4

    II.    THE SAMC DOES NOT PLAUSIBLY ALLEGE THAT THE PROPERTY MANAGEMENT DEFENDANTS SHOULD BE LIABLE AS AGENTS..................8

CONCLUSION.............................................................................................................................11

## TABLE OF AUTHORITIES

Page(s)

**Cases**

*Ago v. Begg, Inc.*,
   705 F. Supp. 613 (D.D.C. 1988), *aff'd*, 911 F.2d 819 (D.C. Cir. 1990) ................................... 8

*Anderson News, L.L.C. v. Am. Media, Inc.*,
   899 F.3d 87 (2d Cir. 2018) ........................................................................................................ 10

*Bell Atl. Corp. v. Twombly*,
   550 U.S. 544 (2007) ................................................................................................................. 2-3

*Flaherty v. Baybank Merrimack Valley, N.A.*,
   808 F. Supp. 55 (D. Mass. 1992) ................................................................................................ 8

*In re Elevator Antitrust Litig.*,
   502 F.3d 47 (2d Cir. 2007) .......................................................................................................... 3

*In re Fresh & Process Potatoes Antitrust Litig.*,
   834 F. Supp. 2d 1141 (D. Idaho 2011) .................................................................................. 9, 11

*In re Graphics Processing Units Antitrust Litig.*,
   527 F. Supp. 2d 1011 (N.D. Cal. 2007) ...................................................................................... 6

*In re Travel Agent Comm'n Antitrust Litig.*,
   583 F.3d 896 (6th Cir. 2009) ................................................................................................. 3, 10

*In re Zinc Antitrust Litig.*,
   155 F. Supp. 3d 337 (S.D.N.Y. 2016) ......................................................................................... 3

*Marion Diagnostic Ctr., LLC v. Becton Dickinson & Co.*,
   29 F.4th 337 (7th Cir. 2022) .................................................................................................. 9, 11

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*,
   475 U.S. 574 (1986) .................................................................................................................. 10

*Monsanto Co. v. Spray-Rite Serv. Corp.*,
   465 U.S. 752 (1984) ................................................................................................................ 2, 9

*Riverview Invs., Inc. v. Ottawa Cmty. Improvement Corp.*,
   899 F.2d 474 (6th Cir. 1990) ..................................................................................................... 10

*SD3, LLC v. Black & Decker (U.S.), Inc.*,
 801 F.3d 412 (4th Cir. 2015) ...............................................................................................3

*Texas Indus., Inc. v. Radcliff Materials, Inc.*,
 451 U.S. 630 (1981)..............................................................................................................9

*Total Benefits Plan. Agency, Inc. v. Anthem Blue Cross & Blue Shield*,
 552 F.3d 430 (6th Cir. 2008) .................................................................................................3

*United Mags. Co. v. Murdoch Mags. Distrib., Inc.*,
 353 F. Supp. 2d 433 (S.D.N.Y. 2004), *aff'd sub nom. United Mag. Co. v. Curtis
 Circulation Co.*, 279 F. App'x 14 (2d Cir. 2008) ....................................................................8

**Other Authorities**

7 Herbert Hovenkamp & Philip E. Areeda, *Fundamentals of Antitrust Law* (3d ed. 2010)............9

Areeda & Hovenkamp, *Antitrust Law* ..................................................................................... 9-10

*Restatement (Third) of Agency* § 7.01 (Am. L. Inst. 2006) ............................................................8

Case 3:23-cv-00331    Document 186    Filed 10/09/23    Page 4 of 19 PageID #: 1375

## INTRODUCTION

The Property Management Defendants bringing this motion[1] fully join in the principal motion to dismiss, which explains that the Multifamily Housing Second Amended Consolidated Class Action Complaint ("SAMC") (ECF No. 530) fails to allege an unlawful agreement between any Defendants and that the SAMC should be dismissed as to all Defendants. The Property Management Defendants also should be dismissed under Fed. R. Civ. P. 12(b)(6) for the separate and independent reasons that (1) the SAMC alleges that building owners, and not property managers, decided whether to use RealPage's revenue management software and follow its rent recommendations and fails to plausibly allege that the Property Management Defendants participated in the alleged conspiracy, and (ii) the SAMC does not plausibly allege they can be liable as agents for the owners.

The SAMC acknowledges the distinct roles played by the building owners and the property managers. *See* SAMC ¶¶ 197–99. The Property Management Defendants are not building owners. They manage multifamily residential properties as agents for their principals, the building owners.[2] SAMC ¶¶ 3, 197-99. Yet the SAMC ignores the legal implications of this distinction.

---

[1] This motion is brought on behalf of Apartment Management Consultants, LLC ("AMC"), Avenue5 Residential, LLC ("Avenue5"), Bozzuto Management Company ("BMC"), First Communities Management, Inc. ("FCM"), FPI Management, Inc. ("FPI"), Pinnacle Property Management Services, LLC ("Pinnacle"), Rose Associates, Inc. ("Rose"), and ZRS Management, LLC ("ZRS"). Collectively, this motion refers to these Defendants the "Property Management Defendants." This motion is not brought on behalf of other Defendants that Plaintiffs identify as "Managing Defendants." This motion is brought without intending any impact as to the ability of other Defendants to raise similar agency arguments in the future.

[2] The SAMC incorrectly lists Pinnacle and Rose as Owner-Operators. *See* ECF 530-1, Appendix A-2. In fact Pinnacle and Rose are only property managers and do not own properties. Pinnacle requested that Plaintiffs correct this error. Plaintiffs requested a declaration from Pinnacle confirming that it is only a property manager, which Pinnacle provided, and Pinnacle has proposed a stipulation to the Plaintiffs to fix this error. Rose is also in the process of requesting that Plaintiffs correct this error.

First, the SAMC attempts to allege a conspiracy to fix rents at multifamily residential properties through an agreement (1) to use RealPage revenue management software, (2) to share data through RealPage, and (3) to follow RealPage's rent recommendations. SAMC ¶ 6. But the SAMC acknowledges that the **building owners** were responsible for these decisions: "the decision whether to use RealPage's RMS rested on the desires of the ***ownership group***," SAMC ¶ 5 (emphasis added), and it is "***up to the Owner*** whether or not a multifamily rental property will price its units according to RealPage's RMS." SAMC ¶ 199 (emphasis added). Thus, the SAMC cannot plausibly allege that the Property Management Defendants directly participated in the alleged conspiracy when they were not making the decision to use RealPage software or to follow its rent recommendations.

Second, the SAMC does not plausibly allege a basis to impose liability on the Property Management Defendants as agents of the owners. As Plaintiffs previously acknowledged (*see* ECF 384 at 6), imposing antitrust liability on an agent for actions of its principal requires that (1) the agent had knowledge of the principal's unlawful objective to restrain trade, (2) the agent intended to restrain trade, and (3) the agent contributed materially to the constraint. But the SAMC fails to plausibly allege any of these necessary elements, much less all of them.

## LEGAL STANDARD

To survive a motion to dismiss, a complaint must include sufficient factual allegations "to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). Cases alleging an antitrust conspiracy require, among other things, "a complaint with enough factual matter (taken as true) to suggest that an agreement was made." *Id.* at 556. The alleged conspirators must have "a conscious commitment to a common scheme." *Monsanto Co. v. Spray-Rite Serv. Corp.*, 465 U.S. 752, 764 (1984). Group pleading is not permissible: the

allegations of a conspiracy must be adequately pled for each and every defendant individually and generic pleading about the conduct of "defendants" as a group is insufficient to state a claim. *See In re Travel Agent Comm'n Antitrust Litig.*, 583 F.3d 896, 905-06 (6th Cir. 2009); *Total Benefits Plan. Agency, Inc. v. Anthem Blue Cross & Blue Shield*, 552 F.3d 430, 435-36 (6th Cir. 2008).

"Generic pleading, alleging misconduct against defendants without specifics as to the role each played in the alleged conspiracy, was specifically rejected by *Twombly*." *Total Benefits*, 552 F.3d at 436. *Accord In re Travel Agent*, 583 F.3d at 905 ("Plaintiffs attempt to implicate these defendants in the purported conspiracy by relying on several vague allegations contained in the Amended Complaint that refer to 'defendants' or 'defendants' executives.' However, plaintiffs' reliance on these indeterminate assertions is misplaced because they represent precisely the type of naked conspiratorial allegations rejected by the Supreme Court in *Twombly*."). To survive a motion to dismiss, "Plaintiffs must be able to separately state a claim against each and every defendant," and each "defendant is entitled to notice of the claims brought against [it]" and "to know how [it] is alleged to have conspired, with whom and for what purpose." *In re Zinc Antitrust Litig.*, 155 F. Supp. 3d 337, 383-84 (S.D.N.Y. 2016). *See also SD3, LLC v. Black & Decker (U.S.), Inc.*, 801 F.3d 412, 422 (4th Cir. 2015) ("A plaintiff in a § 1 case cannot assemble some collection of defendants and then make vague, non-specific allegations against all of them as a group. . . . If [the complaint] fails to allege particular facts against a particular defendant, then the defendant must be dismissed."); *In re Elevator Antitrust Litig.*, 502 F.3d 47, 50-51 (2d Cir. 2007) (affirming dismissal where allegations were "in entirely general terms without any specification of any particular activities by any particular defendant" and explaining that a complaint "without any specification of any particular activities by any particular defendant" is "nothing more than a list of theoretical possibilities, which one could postulate without knowing any facts whatever").

3

# ARGUMENT

Plaintiffs are tenants who allege they rented apartments in multifamily buildings that used RealPage revenue management software. SAMC ¶¶ 681, 697. The SAMC claims that tenants paid higher rents due to a conspiracy to: "share the proprietary data necessary for RealPage's RMS to generate rental price recommendations;" "delegate their rental price and supply decisions to a common decision maker, RealPage;" and "abide by RealPage's price and supply decisions generated by RMS." SAMC ¶ 6. The SAMC specifically alleges that building owners – not the property managers – chose whether to use RealPage revenue management software and whether to follow RealPage's rent recommendations. SAMC ¶¶ 5, 199. The SAMC also acknowledges that building owners and property managers are differently positioned. *See* SAMC ¶¶ 197-99.

Plaintiffs nevertheless seek to lump the Property Management Defendants together with all other Defendants. This improper group pleading seeks to impose liability on the Property Management Defendants for conduct that the SAMC affirmatively attributes to the owners. The Property Management Defendants also cannot be found liable as agents for the owners without plausible factual allegations, which the SAMC lacks, that they knew about, affirmatively joined, and materially advanced the alleged conspiracy of building owners, rather than merely acting in the ordinary course of business to use RealPage software as agents for the owners.

## I. THE SAMC DOES NOT PLAUSIBLY ALLEGE THAT THE PROPERTY MANAGEMENT DEFENDANTS DIRECTLY PARTICIPATED IN THE ALLEGED CONSPIRACY TO USE REALPAGE REVENUE MANAGEMENT SOFTWARE AND FOLLOW ITS RENT RECOMMENDATIONS

The SAMC comes nowhere close to alleging that the Property Management Defendants directly participated in the alleged conspiracy to use RealPage's revenue management software and to follow its rent recommendations. To the contrary, the SAMC affirmatively alleges that the owners made those decisions, contradicting any claim against the Property Management

Defendants. SAMC ¶¶ 5, 199. Yet despite the SAMC acknowledging the distinction between owners and managers, the SAMC still wrongly attempts to apply its generic and conclusory allegations as to all Defendants to the Property Management Defendants.

The SAMC alleges that "every Defendant remaining in this Complaint caused RealPage's RMS to be used and is properly a party of the conspiracy alleged herein," SAMC ¶ 201, and "agree[d] to regularly share confidential, competitively sensitive pricing and lease information with horizontal competitors in order to allow them to adjust prices." SAMC ¶ 75. These generic allegations are inadequate as to all Defendants, and especially as to the Property Management Defendants given the specific allegations that they did not make the decisions whether to use RealPage's revenue manage software or to follow its recommendations. SAMC ¶¶ 5, 199.

Similarly, the SAMC attempts to re-package defective group pleading by using "cut-and-paste" to repeat verbatim the same generic and conclusory allegations individually against each Defendant. Specifically, for each Defendant, it alleges that they "would not have paid for RealPage's RMS pricing services unless: (1) doing so enabled it to set prices above a competitive level; and (2) it knew its competitors were, likewise, using RealPage RMS to set their rental prices in the submarkets in which it operated."[3] Again, these allegations are inadequate as to all Defendants, and especially so as to the Property Management Defendants given the SAMC's allegations that building owners decide whether to use RealPage's software. SAMC ¶¶ 5, 199.

The limited factual allegations in the SAMC that reference particular Property Management Defendants do not suggest that they participated in the alleged conspiracy. None of

---

[3] The specific paragraphs with these "cut-and-paste" allegations include SAMC ¶¶ 68, 70, 72, 74-75, 77-78, 80-81, 83, 85-86, 88-89, 91-92, 94-95, 97-98, 100-01, 103-04, 106-07, 109-10, 112-13, 115-16, 118-19, 121-22, 124-25, 127-28, 130-31, 133-34, 136-37, 139-40, 142-43, 145-46, 148-49, 151-52, 154-55, 157-58, 160-61, 163-64, 166-67, 169-70, 172-73, 175-76, 178-79, 181, 183-84, 186, 188, 190-91, 193.

5

these allegations assert that the Property Management Defendant decided to use RealPage's revenue management software or to follow its recommendations. If anything, these allegations undermine the SAMC's claims: they are inconsistent with the alleged conspiracy and provide legitimate non-conspiratorial reasons for using RealPage's software.

- As to Pinnacle, the SAMC alleges that a Pinnacle employee spoke on a RealPage-run industry panel, SAMC ¶¶ 9, 11. Participation in industry events does not suggest a conspiracy. *See, e.g.*, *In re Graphics Processing Units Antitrust Litig.*, 527 F. Supp. 2d 1011, 1023 (N.D. Cal. 2007) ("Attendance at industry trade shows and events is presumed legitimate and is not a basis from which to infer a conspiracy, without more."). The SAMC also alleges only that the Pinnacle employee offered high-level, general reasons to use RealPage's software such as "leveraging data to make better pricing decisions" and making "less emotional" pricing decisions. SAMC ¶ 11. These statements would be true whether or not competitors used RealPage software and provided legitimate non-conspiratorial explanations as to why building owners might use the software. These statements nowhere reference competitors, suggest that it is important if competitors use RealPage, or in any other way suggest a conspiracy.

- The SAMC also alleges that a former Pinnacle employee stated in a RealPage testimonial that RealPage enables better performance than competitors during a market downturn. SAMC ¶¶ 24, 297. This testimonial undermines the alleged existence of a price fixing conspiracy because it says that RealPage helps a building owner that uses the software outperform the rest of the market. Outperformance of the market is the opposite of a conspiracy among competitors to conspire to raise rents market-wide. This testimonial also nowhere suggests that it matters if competitors use RealPage.

6

- The SAMC also includes alleged statements from Pinnacle employees Witness 6 and Witness 8. The SAMC alleges that Witness 6 was "unable to change or modify the rents set by YieldStar," SAMC ¶ 20, and that Witness 8 said that RealPage's recommendations "caused them to raise monthly rents on some units by several hundreds of dollars during the beginning and middle of the COVID-19 pandemic." SAMC ¶ 23. Witnesses 6 and 8 are also alleged to have said that RealPage helped "avoid a situation where there were a significant number of units renewing at the same time." SAMC ¶ 36. These allegations do not support a conspiracy; one building following RealPage rent recommendations or RealPage recommending increased rents at the beginning of COVID-19 are equally consistent with building owners individually choosing whether to use RealPage software and whether to follow its rent recommendations. Likewise, helping to manage the timing of renewals is a legitimate non-conspiratorial reason why a building owner might use RealPage software. Moreover, as already noted, the SAMC alleges that the building owners – and thus not Pinnacle – decided whether to use RealPage and to follow its rent recommendations, SAMC ¶¶ 5, 199, and so these allegations about Witness 6 and Witness 8 about how RealPage was used would not suggest that Pinnacle directly participated in the alleged conspiracy but would at most just suggest that the owners of these buildings chose to adopt RealPage software and that Pinnacle's employees used the software as agents.

- As to FPI, the SAMC alleges "Witness 2 also worked as a leasing consultant with Defendant FPI Management, Inc. … however ***she did not use RealPage's pricing platform*** at Defendant FPI Management as the building she worked at was classified as affordable housing." *See* SAMC ¶ 18 n.24 (emphasis added).

- As to the other Property Management Defendants, there are no specific allegations.

In short, there are no well-pled allegations that the Property Management Defendants directly participated in the alleged conspiracy. The SAMC does not state a claim against any Defendant. But regardless, the Court should dismiss the Property Management Defendants given that the SAMC acknowledges that the decisions to use RealPage's software and follow its rent recommendations were made by others and the Property Management Defendants at most just used the software as agents for the owners that made the decisions.

## II. THE SAMC DOES NOT PLAUSIBLY ALLEGE THAT THE PROPERTY MANAGEMENT DEFENDANTS SHOULD BE LIABLE AS AGENTS

The SAMC also fails to plausibly allege that any Property Management Defendant can be liable as an agent of its owners. "Only an agent's own tortious conduct subjects the agent to liability …. An agent is not subject to liability for torts committed by the agent's principal that do not implicate the agent's own conduct …." *Restatement (Third) of Agency* § 7.01 (Am. L. Inst. 2006). *See also, e.g.*, *Ago v. Begg, Inc.*, 705 F. Supp. 613, 617-18 (D.D.C. 1988), *aff'd*, 911 F.2d 819 (D.C. Cir. 1990) ("While the law of agency often holds a principal responsible for knowledge known by his agent … it sensibly does not hold agents responsible for knowledge known only by the principal."); *United Mags. Co. v. Murdoch Mags. Distrib., Inc.*, 353 F. Supp. 2d 433, 441 (S.D.N.Y. 2004), *aff'd sub nom. United Mag. Co. v. Curtis Circulation Co.*, 279 F. App'x 14 (2d Cir. 2008) ("Under principles of tort law, an agent is not liable for its principal's tortious conduct …."); *Flaherty v. Baybank Merrimack Valley, N.A.*, 808 F. Supp. 55, 61 (D. Mass. 1992) ("Plaintiffs have offered no legal support for their 'respondeat inferior' theory that the attorney agents are somehow vicariously liable for the tortious acts of their principals.").

These principles of agency law apply with full force in the context of an alleged antitrust conspiracy. As a general matter, "actions under the antitrust laws are analogous to common-law

8

actions sounding in tort." *Texas Indus., Inc. v. Radcliff Materials, Inc.*, 451 U.S. 630, 634 (1981). More specifically, an agent "is not liable for the acts of its alleged principal in a [Sherman Act] § 1 conspiracy unless the agent (1) had 'knowledge of its [principal's] purpose to restrain trade,' (2) 'intended to restrain trade itself rather than simply earn its usual and customary commission,' and (3) 'contribute[d] materially to the restraint.'" *In re Fresh & Process Potatoes Antitrust Litig.*, 834 F. Supp. 2d 1141, 1170 (D. Idaho 2011) (second alteration in original) (quoting 7 Herbert Hovenkamp & Philip E. Areeda, *Fundamentals of Antitrust Law* ¶ 1474c (3d ed. 2010)); *Marion Diagnostic Ctr., LLC v. Becton Dickinson & Co.*, 29 F.4th 337, 350 (7th Cir. 2022) ("To participate in a conspiracy, agents of a defendant must have 'knowledge of the principal's unlawful objective' and 'an intent to restrain trade.'") (quoting Areeda & Hovenkamp, *Antitrust Law* ¶ 1474c). The leading antitrust treatise explains that an agent "must have a stake in the restraint, as distinct from merely selling its own services for their usual market price." Areeda & Hovenkamp, *Antitrust Law* ¶ 1474a. Thus, an agent "who merely earns its commission … does not share a 'conscious commitment to a common scheme designed to achieve an unlawful objective,' as the Supreme Court has required." *Id.* ¶ 1474c (quoting *Monsanto Co.*, 465 U.S. at 764).

Plaintiffs do not come close to meeting these requirements. The SAMC generically alleges that property managers "act as agents for the property owners and knowingly use RMS to coordinate and agree upon rental housing and supply," SAMC ¶ 3. It also contains generic allegations that are essentially the same as to *every* Defendant – whether building owner or property manager – that they entered into "a written contract, paid for, and used at least… RealPage RMS… to manage some or all of its… rental units." *See, e.g.*, SAMC ¶¶ 72; 74; 83; 118; 121; 154; 163; 193. In other words, the SAMC's allegations boil down to asserting that the Property Management Defendants use RealPage's software under contract. But using the RealPage

9

software is a far cry from plausibly alleging that each Property Management Defendant ***knew about the alleged conspiracy***, much less intended to join it or materially contributed to it.

Instead, these allegations just show the Property Management Defendants acting like agents normally act: "merely selling its own services" and "merely earn[ing] its commissions," Areeda & Hovenkamp, *Antitrust Law* ¶ 1474a & c, by acting at the direction of its principal.

Moreover, the SAMC does not allege that the Property Management Defendants receive rent payments in any capacity other than as agents for the building owners. The SAMC does not allege how the Property Management Defendants are compensated or how the alleged conspiracy benefited them. The SAMC's failure to allege the economic incentive for the Property Management Defendants to conspire with building owners bears directly on the plausibility of their involvement in an alleged conspiracy to fix rents. *See, e.g.*, *In re Travel Agent*, 583 F.3d at 909 ("the plausibility of plaintiffs' conspiracy claim is inversely correlated to the magnitude of defendants' economic self-interest"); *Riverview Invs., Inc. v. Ottawa Cmty. Improvement Corp.*, 899 F.2d 474, 483 (6th Cir. 1990) ("A fact finder may not infer a conspiracy if there is no economic motive to conspire and there is a nonconspiratorial explanation for the alleged conspiratorial conduct."); *see also Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 596 (1986) ("Lack of motive bears on the range of permissible conclusions that might be drawn from ambiguous evidence …."); *Anderson News, L.L.C. v. Am. Media, Inc.*, 899 F.3d 87, 102 (2d Cir. 2018) ("In light of the minimal economic benefit that [defendants] would realize … 'defendants had no rational economic motive to join the alleged conspiracies.'").

In short, the lack of well-pled allegations about the knowledge, intent, incentive and actions of the Property Management Defendants means that the SAMC fails to plausibly allege a claim against them. Plaintiffs cannot use the generic allegations made about every Defendant to meet

their burden. Instead, they must make specific allegations about the conspiratorial knowledge, intent, and involvement of the agents themselves. The absence of those allegations compels dismissal of each Property Management Defendant. *See, e.g.*, *Marion Diagnostic Ctr.*, 29 F.4th 337 at 350 (affirming dismissal of complaint that was "silent on whether the [agent] knew of any conspiracy, much less shared an intent to participate in one"); *In re Fresh & Process Potatoes Antitrust Litig.*, 834 F. Supp. 2d. at 1170 (dismissing complaint against marketing agent).

## CONCLUSION

The SAMC now acknowledges the distinction between building owners and property managers and specifically alleges that it is the building owners, not the property managers, that decide whether to use RealPage and whether to follow its recommendations. There are no well-pled allegations that the Property Management Defendants made those decisions. Instead, the SAMC attempts to use "copy-and-paste" generic and conclusory allegations that apply to all Defendants to sweep in the Property Management Defendants, despite the acknowledged differences. The SAMC likewise fails to allege facts that plausibly support liability for the Property Management Defendants in their role as agents for the owners. At most, it alleges that the Property Management Defendants "used" the software at some of the properties that they managed, in accordance with the decisions made by the building owners. But allegations that the Property Management Defendant used RealPage's software do not mean that they knew of the alleged conspiracy, intended to join it, or materially contributed to it.

For all these reasons, Apartment Management Consultants, LLC, Avenue5 Residential, LLC, Bozzuto Management Company, First Communities Management, Inc., FPI Management, Inc., Pinnacle Property Management Services, LLC, Rose Associates, Inc., and ZRS Management, LLC, respectfully request that the SAMC be dismissed in its entirety with prejudice.

DATED: October 9, 2023

Respectfully submitted,

| | |
|---|---|
| */s/ Kenneth S. Reinker* | */s/ Danny David* |
| Kenneth S. Reinker | Danny David |
| kreinker@cgsh.com | danny.david@bakerbotts.com |
| CLEARY GOTTLIEB STEEN & HAMILTON LLP | BAKER BOTTS LLP |
| 2112 Pennsylvania Avenue, NW | 910 Louisiana Street |
| Washington, DC 20037 | Houston, TX 77002 |
| Telephone: (202) 974-1522 | Telephone: (713) 229-4055 |
| | |
| Joseph M. Kay | James Kress |
| jkay@cgsh.com | (*pro hac* forthcoming) |
| CLEARY GOTTLIEB STEEN & HAMILTON LLP | james.kress@bakerbotts.com |
| One Liberty Plaza | Paul Cuomo |
| New York, NY 10006 | (*pro hac* forthcoming) |
| Telephone: (212) 225-2745 | paul.cuomo@bakerbotts.com |
| | BAKER BOTTS LLP |
| *Counsel for Defendant Pinnacle Property Management Services, LLC* | 700 K. Street, NW |
| | Washington, DC 20001 |
| | Telephone: (202) 639-7884 |
| | |
| | *Counsel for Defendant Avenue5 Residential, LLC* |

| | |
|---|---|
| */s/ James D. Bragdon* | */s/ Charles H. Samel* |
| James D. Bragdon | Charles H. Samel |
| jbragdon@gejlaw.com | charles.samel@stoel.com |
| Sam Cowin | Edward C. Duckers |
| scowin@gejlaw.com | ed.duckers@stoel.com |
| GALLAGHER EVELIUS & JONES LLP | STOEL RIVES LLP |
| 218 N. Charles St., Suite 400 | 1 Montgomery Street, Suite 3230 |
| Baltimore, MD 21201 | San Francisco, CA 94104 |
| Telephone: (410) 727-7702 | Telephone: (415) 617-8900 |
| | |
| Philip A. Giordano (admitted *pro hac vice*) | George A. Guthrie |
| philip.giordano@hugheshubbard.com | gguthrie@wilkefleury.com |
| HUGHES HUBBARD & REED LLP | WILKE FLEURY LLP |
| 1775 I Street NW | 621 Capitol Mall, Suite 900 |
| Washington, DC 20007 | Sacramento, CA 95814 |
| Telephone: (202) 721-4776 | Telephone: (916) 441-2430 |
| | |
| Charles E. Elder, BPR # 038250 | *Counsel for Defendant FPI Management, Inc.* |
| celder@bradley.com | |
| BRADLEY ARANTBOULT CUMMINGS LLP | |
| 1600 Division Street, Suite 700 | |
| Nashville, Tennessee 37203 | |
| Telephone: 615.252.3597 | |

*Counsel for Defendant Bozzuto Management Company*

| | |
|---|---|
| */s/ Ferdose al-Taie* | */s/ Richard P. Sybert* |
| Ferdose al-Taie (admitted *pro hac vice*) | Richard P. Sybert (WSBA No. 8357) |
| faltaie@bakerdonelson.com | rsybert@grsm.com |
| BAKER, DONELSON, BEARMAN CALDWELL & BERKOWITZ, P.C. | GORDON REES SCULLY MANSUKHANI |
| 956 Sherry Lane, 20th Floor | 701 Fifth Avenue, Suite 2100 |
| Dallas, TX 75225 | Seattle, WA 98104 |
| Telephone: (214) 391-7210 | Telephone: (206) 321-5222 |
| | *Counsel for Defendant Rose Associates Inc. and First Communities Management, Inc.* |
| Christopher E. Thorsen (BPR # 21049) | |
| cthorsen@bakerdonelson.com | |
| BAKER, DONELSON, BEARMAN CALDWELL & BERKOWITZ, P.C. | */s/ Sarah B. Miller* |
| Baker Donelson Center, Suite 800 | Sarah B. Miller (TN#33441) |
| 211 Commerce Street | BASS, BERRY & SIMS PLC |
| Nashville, TN 37201 | 150 Third Ave. South #2800 |
| Telephone: (615) 726-5600 | Nashville, TN 37201 |
| | Telephone: (615) 742-6200 |
| *Counsel for Defendant ZRS Management, LLC* | smiller@bassberry.com |
| | |
| | Amy F. Sorenson (pro hac vice forthcoming) |
| | SNELL & WILMER, L.L.P. |
| | 15 West South Temple, Ste. 1200 |
| | Salt Lake City, UT 84101 |
| | Telephone: (801) 257-1900 |
| | asorenson@swlaw.com |
| | |
| | Colin P. Ahler (pro hac vice forthcoming) |
| | SNELL & WILMER, L.L.P. |
| | One East Washington St., Ste. 2700 |
| | Phoenix, AZ 85004 |
| | Telephone: (602) 382-6000 |
| | cahler@swlaw.com |
| | |
| | *Counsel for Defendant Apartment Management Consultants, LLC* |

14

## CERTIFICATE OF SERVICE

I hereby certify that on October 9, 2023, I electronically filed the foregoing document with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to all attorneys of record registered on the CM/ECF system.

DATED this 9th day of October 2023.

/s/ *Kenneth S. Reinker*
Kenneth S. Reinker